# MAURICE PAUL BURNETTE *v.* STATE OF MARYLAND

[No. 611, September Term, 1971.]

*Decided May 19, 1972.*

The cause was submitted on briefs to THOMPSON, MOY-
LAN and GILBERT, JJ.

Submitted by *James C. Cawood, Jr.,* for appellant.

Submitted by *Francis B. Burch, Attorney General, Harry A. E. Taylor, Assistant Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *E. Garrison Neal, Assistant State's Attorney for Prince George's County,* for appellee.

THOMPSON, J., delivered the opinion of the Court.

Maurice Paul Burnette contends his conviction for rape in the Circuit Court for Prince George's County, by Judge Ralph W. Powers presiding without a jury, should be reversed because the trial judge was clearly in error when he found the prosecuting witness did not consent to the act of intercourse and because the state introduced certain testimony concerning polygraph tests.

On February 24, 1971, Burnette made a date with Bonita Vernon, the prosecutrix, by telephone for later that evening. Although they had been on at least a couple of double dates previously, this was their first date with each other. Burnette picked up Miss Vernon at her apartment and then stopped to purchase a six-pack of beer. The testimony of the prosecutrix which bears directly upon the issue of consent was as follows:

> Q. "And did there ever come a time when he stopped the car that you were in?
> A. "Aside from buying the beer, yes.
> Q. "Where was this?
> A. "He was going down a dead end and I said, 'Maurice, where are you going?' He said, 'I don't know, but I'm going to turn around.' So he turned the car around but he stopped. He turned off the ignition. I said, 'You're not going anywhere.' And so then he tried to kiss me. So I let him kiss me one time.
> \* \* \*
> Q. "Okay, and after he kissed you one time what, if anything, did you say?

A. "He tried to make an advance. He tried to feel me up, and—

Q. "What do you mean feel you up?

A. "Tried to feel my breast.

Q. "What happened then?

A. "I asked him to stop. And then I said, 'I want to go home now.' He said, 'Why?' I said, 'Because I have got to go to work tomorrow.' And he said, 'Okay, I'll take you home. First you got to do what I want you to do.'

Q. "What happened then?

A. "Well, I didn't believe him at first and I sat and I looked at him. He said. 'Okay, now, Bonnie, Take your pants off or I will.' And I said, 'No.' And he kept telling me, repeating this, 'I'm not playing games now, take them off or I will.' I kept saying, 'Maurice, let's talk, let's talk.' And he said, 'Okay, Bonnie, what do you want to talk about?' I said, 'You know, why are you doing this?' And he said, 'Because I know you will never go out with me again.' And I said, 'Yes, I will. Just take me home and I won't tell anybody if you won't. Just take me home. Just take me home.' And so he told me, no, that's not the way it was going to be, that I was going to take my pants off. And he had had his arm around me and I tried to move away. He said, 'You want to fight? Okay, we'll fight.' He hit me in my face a couple of times.

Q. "What did he hit you with?

A. "Just his hand.

Q. "Was his hand open or closed?

A. "I don't know.

Q. "As a fist?

A. "I don't know.

Q. "Where did he strike you?

A. "In my face.

Q. "What happened then?

A. "And so then he took my head and he pushed

374

it all the way back in the seat of the car and covered my . . . face with his hand."

* * *

Q. "He pressed your head back over what?
A. "Over the seat, the back of the seat.
Q. "And what did you do when he did this?
A. "That's when I knew I wasn't going to win. It's when I gave up.
Q. "And why did you give up?
A. "Because he was going to hurt me.

* * *

Q. "Did you consent to this? Did you agree to let him do this?
A. "I didn't have much choice.
Q. "Why did you allow him to have intercourse with you?
A. "Because he had already struck me a couple of times, he had already pushed my face back, and if I had fought him any more I am sure that I would have really gotten hurt.

* * *

Q. "Would you state whether or not you had any conversation with him about your physical condition at this time?
A. "I had told him before that—first I told him that I was on my period, and he told me it didn't matter. I told him I had V.D., and he said that didn't matter. I told him I was built funny and he told me that didn't matter.
Q. "And was this before or after he struck you?
A. "This was before.
Q. "And can you state whether or not any of these conditions were true that you had related to him?
A. "I was on my period.
Q. "And how long did this intercourse take place?
A. "Fifteen, twenty minutes.

Q. "And what were you doing during the intercourse?

A. "Crying."

The witness further testified that after the intercourse Burnette took her to her apartment where she told her roommate what had occurred but because of fear and confusion she did not report the matter to the police department until two days later. Her roommate testified corroborating the prosecutrix especially in that she had two bruises, one on the left side of her face and one on the left side of her nose and that her clothing was covered with blood, presumably from the menstrual discharge and that her clothing and hair were disheveled. She said the victim was "crying hard" upon her arrival at the apartment and was very upset for the next few days.

Burnette testified admitting the intercourse but stated that it occurred with the prosecutrix' full consent and cooperation and denied that he struck her. He admitted that after the police had initially questioned him concerning the incident he gave up his job and went to Florida for a period of about four weeks.

On appeal he relies on *Winegan v. State,* 10 Md. App. 196, 268 A. 2d 585, in which we reversed a rape conviction where the evidence showed that the victim was accosted on a public street and walked with the accused five blocks to his apartment, followed him up three flights of stairs to the apartment, all without any direct threats or physical abuse. In that case we said:

> "While we are frequently called upon to review the sufficiency of the evidence in rape cases, most of them are so clear it is seldom necessary to review the law in any great detail; however, two cases recently have required a detailed review, *Walter v. State,* 9 Md. App. 385, 264 A. 2d 882 and *Rice v. State,* 9 Md. App. 552. In both we held where the *victim's story could not be corroborated by wounds, bruises or disordered clothing,* the lack of consent could be shown by

fear based upon reasonable apprehension. The rule requiring the apprehension be reasonable was first enunciated in Maryland in *Hazel v. State,* 221 Md. 464, 469, 157 A. 2d 922: 'If the acts and threats of the defendant were reasonably calculated to create in the mind of the victim—having regard to the circumstances in which she was placed—a real apprehension, due to fear, of imminent bodily harm, serious enough to impair or overcome her will to resist, then such acts and threats are the equivalent of force.' (Emphasis added).

"The rule of reason, as we shall call it, was reiterated, either expressly or impliedly, by us in *Walter v. State, supra* and *Rice v. State, supra.* It is expressly supported by several cases throughout the country." (Citations omitted).

The error of Burnette's position in relying on *Winegan v. State* is the rule applies where the "victim's story could not be corroborated by the wounds, bruises or disordered clothing". In the instant case the victim's testimony was corroborated by bruises and disordered clothing; therefore the rule of reason as expressed in *Winegan* is not directly applicable.

In *Rice v. State, supra,* at page 560, we said:

"In *Hazel* [*supra*] the contention was made the victim did not resist at the actual time of the intercourse, but after citing the difference between submission and consent, the Court found there were sufficient threats of violence prior thereto to justify the trial court's finding that rape had occurred. In *Walter* we found the victim's fear of policemen was sufficient, under the circumstances, to support the trial court's finding that the victim submitted to the intercourse only through fear.

"The appellant relies on several Illinois cases, *People v. DeFrates,* 33 Ill. 2d 190, 210 N.E.2d

467; *People v. Qualls,* 21 Ill. 2d 252, 1. N.E.2d
612; *People v. Helton,* 245 N.E.2d 1, which,
while recognizing the rule a woman need not
resist an unwanted sexual relationship if she is
reasonably in fear of her safety, apply the rule
most strictly and, in our opinion, are thus too
narrow in requiring physical resistance by the
victim. We do not think sound public policy re-
quires a woman to resist to the extent that she
runs a substantial risk of grievous bodily harm.
The sounder test is whether the act was per-
formed with or without the consent of the prose-
cuting witness."

The thought expressed in *Rice* is dispositive of Bur-
nette's claim. The witness testified that from the physical
attack upon her she felt that if she had "fought him any-
more I am sure I would have really gotten hurt." The trial
judge accepted this testimony as true and there is no
basis for us to say, under Maryland Rule 1086, that his
finding was clearly erroneous. Such a finding supports
the public policy recited in *Rice, supra,* that the resis-
tance required of a woman to support a rape conviction
should not be so great as to require her to run a substan-
tial risk of grievous bodily harm. The victim in the in-
stant case was alone with appellant who in a lonely spot
assaulted and beat her. There is nothing to indicate he
would not have beaten her more substantially if she had
continued to resist his advances.

Although it appears that the state went out of its way
to refer to certain lie detector tests, the trial judge stead-
fastly refused to accept the evidence and stated he would
not consider any reference to such tests. If this were a
jury trial, a more serious problem would be presented,
but as the Court of Appeals said in *State v. Babb,* 258
Md. 547-550, 267 A. 2d 190, "The assumed proposition
that judges are men of discernment, learned and experi-
enced in the law and capable of evaluating the material-
ity of evidence, lies at the very core of our judicial sys-
tem. Such an assumption would be completely unwar-

ranted with regard to a jury of laymen and the impact which evidence may have upon their deliberative powers." In the instant case the trial judge stated he was not considering the improper evidence and although the State should have been more careful not to have brought such evidence in the record, we must find the error on the part of the prosecutor harmless. See also *State v. Hutchinson,* 260 Md. 227, 271 A. 2d 641, and *Lusby v. State,* 217 Md. 191, 141 A. 2d 893.

*Judgment affirmed.*