## JAMES R. DOVE, SR. *v.* STATE OF MARYLAND

[No. 137, September Term, 1976.]

*Decided November 9, 1976.*

602

The cause was argued before GILBERT, C. J., and THOMPSON and MOORE, JJ.

*Philip A. Dales, III, Assigned Public Defender,* for appellant.

*Stephen B. Caplis, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Albert*

*Gallatin Warfield, III, Assistant Attorney General, Warren B. Duckett, Jr., State's Attorney for Anne Arundel County,* and *Gerald K. Anders, Assistant State's Attorney for Anne Arundel County,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

The appellant, James R. Dove, Sr., was convicted by a jury in the Circuit Court for Anne Arundel County, Judge Matthew S. Evans presiding, of rape and sentenced to seven years. On this appeal Dove raises five issues:

> 1) The trial court unduly restricted the scope of cross-examination;
>
> 2) The trial court incorrectly disqualified a character witness;
>
> 3) The trial court improperly restricted appellant's direct examination of several witnesses by sustaining objections on the grounds that the questions were leading;
>
> 4) The evidence was insufficient in regard to lack of consent on the part of the victim;
>
> 5) The trial court committed reversible error when it gave an "Allen" charge to the jury.

Margaret (Meg) Welles, the then fifteen year old prosecutrix, testified that at a few minutes before midnight on July 24, 1975, she was walking home near Mayo Beach. A car driven by the appellant passed, stopped, and the passenger, Mark Dove, called her name. Meg walked up to the automobile and inquired as to the whereabouts of her boyfriend, Rusty. She was told that he had last been seen near her house. She then accepted an offer to drive her home. After getting into the car, the three drove to a bar called Captain Seaweed's. They conversed with a man by the name of George for several minutes in the parking lot and then drove to Beach Three in Woodland Beach. Mark Dove exited the car and the prosecutrix attempted to get out, since she lived "right around the corner," but her arm was grabbed by the appellant. The door closed and the appellant drove to a school yard on Mayo Road. The appellant began

kissing the prosecutrix and she "halfway kissed him back once." She then tried to push him away and open the car door, which she found to be locked. While she was attempting to open the door, the appellant ripped her blouse, unzipped her pants, and tried to pull them down. At this point the prosecutrix asked to be let out of the car to go to the bathroom. The appellant stated that he would agree to this only if she took her pants off, which she refused. He then crossed over the seat, opened the door on the driver's side, got out of the car, and pulled the prosecutrix across the seat and out of the car, so they were standing together. The girl broke free and began to run but tripped and fell. She began to scream. The appellant fell on top of her and cupped his hand over her mouth. She pulled his hand from her mouth and continued to scream. Finally, he cupped her nose and mouth so she could not breathe and told her not to make any more noise. To this she replied, "Okay. Okay." He then held her hands over her head, undressed them both, and had intercourse with her. At the conclusion of this the prosecutrix was allowed to walk to the end of the nearby pier. The appellant got into his automobile and left. The prosecutrix began to walk home. On the way she saw Jean and Sue Brady. She told them she had been raped and they took her home. After she could calm herself enough to tell her grandmother what had happened she was taken to the police station where she filed a complaint. As a result of this incident the prosecutrix received a scrape on one of her elbows and on the small of her back.

Elsie L. Behlke testified that shortly after 1:00 a.m. on the night in question she was lying in bed in her home when she heard very loud crying coming from the area of the Edgewater School. It was the voice of a young lady or woman, and it sounded "like she was pleading." This continued for approximately twenty minutes so Mrs. Behlke called the police. After the call to the police, the crying ceased and the witness heard a car door slam and a motor start.

It was stipulated that a doctor's report of an examination of the prosecutrix offered into evidence showed the presence

of spermatozoa but no evidence of trauma, swelling or bruising anywhere on her body.

The appellant testified that following the championship victory of his softball team, he went to a celebration at the tavern of his team's sponsor, Captain Seaweed's. After consuming a number of beers, he and Mark Dove left the tavern and drove around the neighborhood. On Londontowne Road they observed the prosecutrix waving so they stopped. The prosecutrix got into the car between the two men. They drove to Captain Seaweed's where the appellant asked the prosecutrix to go parking. She agreed. The appellant drove to Beach Three where he let Mark Dove and another companion who had gotten into the car at Captain Seaweed's out of the automobile. In response to a question from Mark Dove concerning whether she was getting out of the car the prosecutrix replied that she was staying. They then drove to Pine Whiff Beach. Upon arriving at the beach the appellant got out of the car to go to the bathroom. He got back in the car and began kissing the prosecutrix. In order to attain a more comfortable setting they got out of the car. The prosecutrix voluntarily laid on the ground and took her pants off. The appellant had intercourse with her to which there was no objection. No force was used. At the culmination of this he informed her that he had to go home because his wife would be worried. At this point the prosecutrix became angry, walked down the pier, and refused an offer for a ride home. The appellant left.[1]

## Cross-Examination

The appellant cites three areas in which his cross-examination of the prosecutrix was limited by the trial court and contends that this denied him a fair and impartial trial.

During the course of cross-examination the prosecutrix was asked twice whether prior to meeting the appellant and

---

1. It should be noted the appellant in his brief consistently cites facts which are not in the record. We decide the case upon the record. Green v. State, 23 Md. App. 680, 329 A. 2d 731 (1974).

Mark Dove on the night in question she had been in the presence of anyone who was smoking marijuana. Objections to these questions were sustained by the trial court.

Generally, cross-examination is restricted to those points on which the witness had testified on direct examination. *Caldwell v. State,* 276 Md. 612, 349 A. 2d 623 (1976). This rule is not applied to limit cross-examination of the witness to specific details brought out on direct examination "but permits full inquiry of the subject matter." *Williams v. Graff,* 194 Md. 516, 522, 71 A. 2d 450 (1950). Furthermore, it is proper to allow any question which reasonably tends to explain, contradict, or discredit any testimony given by the witness in chief, or which tends to test his accuracy, memory, veracity, character, or credibility. *DeLilly v. State,* 11 Md. App. 676, 681, 276 A. 2d 417 (1971). Seemingly therefore, a witness may be questioned regarding whether he was sober, intoxicated, or under the influence of drugs at the time of the event in question. 2 *Wharton's Criminal Evidence* § 434. The appellant alleges in his brief that these questions were not a mere fishing expedition since he had a basis for believing that the witness used marijuana and possibly used it on the night in question. The basis for this belief was not conveyed to the trial judge. We are not persuaded that the trial judge abused his discretion by restricting cross-examination in this situation where it appears totally immaterial whether anyone in the prosecutrix's presence was smoking marijuana. If there were a legitimate basis for this line of questioning counsel should have preliminarily satisfied the trial judge's doubts. *See Mulligan v. State,* 18 Md. App. 588, 597, 308 A. 2d 418 (1973).

Secondly, the appellant contends that he was wrongfully excluded from cross-examining the prosecutrix in reference to prior inconsistent statements made by her to the examining doctor, the detective, the polygraph examiner, and her neighbor. On cross-examination the witness was asked the following:

"Q. Now, after this occasion, were you ever examined by a doctor?

A. Yes. That night.

Q. That night?

Mr. Anders: Objection. That wasn't covered on direct.

Court: Sustained.

Mr. Weidemeyer: I'll strike it."

\* \* \*

"Q. Now, what did you tell the doctor when you were examined?

Mr. Anders: Objection.

Court: Sustained.

Q. Did you talk to a Detective?

A. Yes.

Q. When did you talk to a Detective?

A. I was taken to the Police Station and that's where Detective Marshall was called. When I got to the hospital, Detective Marshall was there.

Q. Well, what did you tell him?

Mr. Anders: Objection.

Court: Sustained.

Mr. Weidemeyer: I have no further questions.

Mr. Anders: I have no further questions."

As we have noted before the appellant had the right to discredit the testimony given by the witness through the use of prior inconsistent statements. *DeLilly v. State, supra.* Under certain circumstances it is not necessary for the appellant to proffer what the alleged inconsistent statements contain in order to present them into evidence. *Yowell v. State,* 28 Md. App. 279, 283, 344 A. 2d 442 (1975). In the case at bar, however, there was not even a suggestion that the appellant was attempting to impeach by the use of a prior inconsistent statement. Under direct examination the witness testified to the circumstances of the confrontation. Her statements to the police and the examining physician were not discussed in any detail. With the facts before him

at the time of the cross-examination we find that the trial judge did not abuse his discretion by sustaining objections on the grounds that appellant's questions went beyond the scope of direct examination. It was necessary for the appellant to lay some foundation in order to impeach the witness by the use of her prior statements. *White v. State*, 23 Md. App. 151, 162, 326 A. 2d 219 (1974). We further note that the appellant introduced the doctor's report for identification and the investigating officer was called to the stand to testify. The appellant had ample opportunity to pursue the inconsistencies at those times.

The third alleged error concerning the restriction of cross-examination deals with the appellant's right to question the witness in regard to a sexual act with her boyfriend occurring two nights before the night in question. At the outset of the trial, the State made an oral motion *in limine* to exclude testimony concerning prior acts of intercourse between the victim and third persons. The following transpired:

> "I think that if a doctor's report shows upon examination sperm, it's entirely proper to go into the question of when and with whom, other persons, the complaining witness may have had intercourse. So I think that under those circumstances, we would be entirely justified in investigating on that point as well as to attempt to bring in evidence of such.
>
> Mr. Anders: Well, I don't quite understand that argument, but it's still my understanding of Maryland law that prior acts of intercourse with anyone other than the defendant is inadmissible . . .
>
> Court: Well, that's correct.
>
> Mr. Anders: . . . at a trial, and so I would request that that question not be asked.
>
> Court: Well, don't ask the question, but at the time you want to ask it, approach the bench and I

> will hear what you have to say and then either
> permit you to ask it or not."

No questions were asked at trial concerning the prior sex acts. In the absence of such questions we decline to decide this point initially on appeal. Md. Rule 1085.

At the sentence hearing the appellant made a motion for a new trial. One of the grounds for this motion was that *Deinhardt v. State*, 29 Md. App. 391, 348 A. 2d 286 (1975) and *State v. DeLawder*, 28 Md. App. 212, 344 A. 2d 446 (1975), stand for the proposition that the appellant should have been allowed to introduce testimony concerning a prior sex act of the prosecutrix because it was the rejection from that act plus the rejection of love from the appellant which motivated her to fabricate the rape charge. We agree that these cases stand for the proposition that questions designed to develop bias, prejudice, or ulterior motive are admissible. Again we point out, however, that the trial judge did not prevent the defense from raising these questions on cross-examination but stated that he would decide the point when it arose. The issue never arose.

### Character Witness

During the presentation of his defense the appellant called Rosemarie Paddy to the stand. She stated that she had known Meg Welles for about five years and knew other people in the community in which she and Meg lived who also knew Meg. She stated that she had "been to a lot of parties where she's (Meg) been, and she doesn't have a very good reputation." When asked whether other people who knew Meg felt the same way, however, the witness replied, "I don't know, really. I can't say that. I don't know." On cross-examination she stated that the basis for her opinion was that she had heard a lot of guys talk about Meg and had seen Meg at parties with different guys. She admitted that the boys say a lot of things that are untrue in this regard and she did not always believe what was said. The trial judge ruled that she was not qualified.

In *Caldwell v. State, supra* at 614, 615, it was reiterated

that the general reputation in a particular community of a rape complainant for chastity is admissible where consent is an issue. The common law rule does not permit the witness to express her own independent opinion even though it may be based on acquaintance, observations or actual knowledge. *Taylor v. State*, 28 Md. App. 560, 568 n.6, 346 A. 2d 718 (1975), *aff'd*, 278 Md. 150, 360 A. 2d 430 (1976). The witness stated that she was only testifying as to her own opinion of Meg's reputation and did not know what her general reputation was. For this reason she could not qualify as a character witness under the common law.

The common law rule appears to have been modified by Courts and Judicial Proceedings Article § 9-115 which provides:

> "Where character evidence is otherwise relevant to the proceeding, no person offered as a character witness who has an adequate basis for forming an opinion as to another person's character shall hereafter be excluded from giving evidence based on personal opinion to prove character, either in person or by deposition, in any suit, action or proceeding, civil or criminal, in any court or before any judge, or jury of the State."

As a result of this enactment if the witness had an adequate basis for her testimony it should have been admitted. The basis for her testimony was that she had seen Meg with "a couple of different guys at a couple of different parties." There were always numerous boys and girls at these parties. The witness had never observed Meg doing anything immoral or improper. She had heard boys talk about Meg, but a lot of the things they said about the girls were unfair. The underlying purpose of the rules governing the admissibility of evidence is to assure that the reputation evidence received is that which indicates the true character of the individual. It is in the discretion of the trial judge to determine whether the reputation sought to be proved meets this standard. While we recognize that the witness had known the prosecutrix for five years we cannot say that the

trial judge abused his discretion when the basis of the witness's testimony was the statements of boys' sexual conquests when she recognized that in many cases they were exaggerated.

## *Leading Questions*

The appellant cites three areas in which objections to his questions on direct examination were sustained and contends that these rulings were erroneous and greatly prejudiced his defense. Two of these areas concern an attempt to elicit testimony concerning the prosecutrix's sobriety and physical condition. During the direct examination of Harry Dove, the appellant's father, the witness was asked:

"Q. Okay. Now, at that time, would you please give the jury your opinion of your son's sobriety.

Mr. Anders: Objection.

Court: I'll sustain the objection.

Q. How did your son act?

A. Well, he acted like he was under the influence of alcohol.

Q. Okay. How about the other people in the car?

Mr. Anders: Objection.

Court: Sustained.

Q. Okay, did you see anyone in the car consume any alcohol?

Mr. Anders: Objection.

Court: Sustained.

Q. What was Mark Dove doing in the car?

Mr. Anders: Objection.

Court: I'll sustain the objection."

While George Rawlings was testifying on direct examination the following transpired:

"Q. Okay. What did you see Jim doing?

A. What did I see him do?

Q. Yes. When you first saw him.

Mr. Anders: Objection.

Court: Sustained.

Q. Where were you out at Captain Seaweed's?

A. I was out on the parking lot.

Q. What did you see while you were out there?

Mr. Anders: Objection.

Court: Would you two approach the bench a minute, please?

(Bench Conference)

Court: The questions you're asking are leading. They suggest an answer. That's what a leading question is. The first thing you say is what was the defendant doing. We don't know whether he was doing anything.

Mr. Dales: Okay.

Court: See? You suggest an answer to him, and you can't do that.

Mr. Dales: I can ask him what he saw, can't I?

Court: Well . . .

Mr. Anders: Ask him the day of this occurrence . . .

Court: . . . in connection with this case. He might have said he saw a flying star."

\* \* \*

"Q. When you got in the car and were talking to them, what did you observe the parties inside the car doing?

Mr. Anders: Objection.

Court: Sustained.

Q. Did you talk to Jim?

Mr. Anders: Objection.

Court: Well, I'll let him answer that.

A. I didn't talk to him. I was talking to Mark and the rest of them.

Q. What did you observe the three of them doing when you got in the car?

Mr. Anders: Objection.

Court: Sustained.

Mr. Dales: I beg the Court's indulgence for a minute.

Q. What, if anything unusual, did you observe when you got in the car?

A. Meg was crying. I asked Mark what's she crying about. And he said something about Rusty, or something.

Q. What did she say?

Mr. Anders: Go ahead.

A. I really couldn't really understand. She was, like, crying. I couldn't understand what she was talking about, what she was saying.

Q. Okay. What condition was Meg in?

Mr. Anders: Objection.

Q. Did you observe Meg's demeanor when you got in the car?

A. Demeanor?

Q. Her . . .

Mr. Anders: He's already testified she was crying, Your Honor.

Q. Did you observe anything else?

A. She seemed like she was drunk.

Mr. Anders: Objection, and ask that it be stricken.

Court: Strike it out.

Q. What makes you . . . what did Meg do that made you draw that conclusion?

Mr. Anders: Objection.

Court: Sustained.

Q. Did you observe . . . what did you observe in the car?

Mr. Anders: Objection.

Court: I'll sustain the objection.

Q. What happened after you got in the car?

Mr. Anders: Objection.

A. We stayed there for awhile . . .

Court: Well, wait a minute. I'll sustain the objection.

Mr. Weidemeyer: Could we have the Court's reason for sustaining the objection? We must take an exception. We're trying to develop some facts and there's objection to everything.

Court: Well, they're leading questions.

Mr. Weidemeyer: What did he observe isn't a leading question, if Your Honor please.

Court: (unintelligible) the question, but . . ."

"A leading question generally is a question which suggests to the witness the specific answer desired or a question admitting of being answered by a simple 'yes' or 'no'." *Johnson v. State*, 9 Md. App. 327, 332, 264 A. 2d 280 (1970). "Questions . . . which so suggest the *specific tenor of the reply as desired by counsel* that such a reply is likely to be given irrespective of an actual memory, are illegitimate." 3 Wigmore, *Evidence* § 769, at 154 (Chadbourn rev. 1970). "[T]he permissibility of leading questions is primarily within the sound discretion of the trial judge, and his judgment in this respect will not be overturned on appeal unless there has been an abuse of his discretion as to prejudice the rights of the accused to a fair trial." *Hubbard v. State*, 2 Md. App. 364, 368, 234 A. 2d 775 (1967). The reason for this is that it is not only the wording of the question which may make it leading but the emphasis and manner in which it is asked. The trial judge is in the better position to make a decision.

In the first situation the witness had just answered a question that his son appeared to be under the influence of alcohol. In the context of that question we cannot say that the trial judge abused his discretion by finding that the

follow-up question concerning the other people in the car suggested "a specific tenor of reply desired by counsel."

In the second instance we cannot find that all the questions to which objections were sustained by the trial judge were leading. On the other hand we cannot see how this prejudiced the appellant's right to a fair trial. The most that the appellant hoped to achieve was that the statement that "[s]he seemed like she was drunk" would remain in the record. The prosecutrix testified on direct examination that she had consumed four beers and that if she drank over five beers she lost control over herself. The fact that she seemed drunk to George Rawlings does not mean that she could not have been raped. It was a matter for the finder of fact to determine the condition of the prosecutrix and what effect that had on the occurrences of the night in question. Regardless of how she appeared, the issue boiled down to whether the finder of fact believed her testimony that she was not so intoxicated that she did not resist the sexual advances of the appellant and submitted strictly from force.

The third area in which the appellant contends his questioning was erroneously restricted concerns the testimony of the prosecutrix's next-door neighbor. Meg's grandmother had testified that she is supposed to be home by midnight. The appellant attempted to extract testimony from the neighbor that she did not always get home at that time. The trial court ruled that this was irrelevant.

The evidentiary question decided by the trial judge was whether the proffered evidence tended to prove or disprove the crime charged. *Baxter v. State*, 223 Md. 495, 165 A. 2d 469 (1960). No precise and universal test of relevancy of evidence is furnished by law, the determination of which rests largely in the discretion of the trial court. *Baumgartner v. State*, 21 Md. App. 251, 259, 319 A. 2d 592 (1974). Whether Meg had surpassed her curfew on one or several prior occasions appears to have no bearing on the night in question. We see no abuse of discretion.

*Sufficiency of the Evidence*

Relying on *Winegan v. State*, 10 Md. App. 196, 268 A. 2d

585 (1970), in which a rape conviction was reversed where the victim was confronted by the accused on a public street and followed him home, five blocks and three flights of stairs away without any direct threats or physical abuse, the appellant asserts that there was insufficient evidence of force and the fear of the victim was so unreasonable under the circumstances that the case should not have gone to the jury. In that case we said:

> "[W]here the victim's story could not be corroborated by wounds, bruises or disordered clothing, the lack of consent could be shown by fear based upon reasonable apprehension. The rule requiring the apprehension be reasonable was first enunciated in Maryland in *Hazel v. State*, 221 Md. 464, 469, 157 A. 2d 922:
>
>> 'If the acts and threats of the defendant were reasonably calculated to create in the mind of the victim — having regard to the circumstances in which she was placed — a real apprehension, due to fear, of imminent bodily harm, serious enough to impair or overcome her will to resist, then such acts and threats are the equivalent of force.' "

*Id.* at 200, 201.

The appellant contends that if we keep in mind the presumption of innocence, the ease with which a woman can make the charge of rape, and the difficulty of disproving the charge, especially where intercourse occurred, then the testimony concerning the victim's screaming, the scrapes on the victim's elbow and back, her torn halter top, the cupping of her mouth and nose, and the testimony of Mrs. Behlke were not sufficient to corroborate the lack of consent. Even though the medical report stated that there was no evidence of external trauma the victim produced both photographs and testimony of the bruises. "[T]he test as to whether the evidence was sufficient in law to permit the trial judge properly to deny the appellant's motion for judgment of

acquittal and to submit the case to the jury is whether the admissible evidence adduced at the trial either showed directly, or circumstantially, or supported a rational inference of, the facts to be proved, from which the jury could fairly be convinced, beyond a reasonable doubt, of the appellant's guilt of the offense charged." *Andresen v. State,* 24 Md. App. 128, 209, 331 A. 2d 78 (1975). The rule in *Winegan,* however, is inapplicable where as here the victim's story could be corroborated by the scrapes and torn clothing.

In *Burnette v. State,* 15 Md. App. 371, 377, 290 A. 2d 816 (1972), we again approved the reasoning in *Rice v. State,* 9 Md. App. 552, 267 A. 2d 261 (1970), that sound public policy does not require a woman to resist to the extent that she runs a substantial risk of grievous bodily harm. It was found in that case that where the victim was alone with the appellant who in a lonely spot struck her in the face and pushed her face back in the seat by covering it with his hand it was inconsequential that she ceased to resist. In the instant case there was testimony that the victim tried to run, but was leaped upon and smothered when she fell. There is nothing to indicate that she would not have been injured more substantially if she had continued to resist his advances. There was sufficient evidence for the jury to find that the sexual act was not a product of her consent.

### *Jury Instructions*

The record reveals that after an almost four-hour deliberation the jury sent a note to the trial judge.[2] The trial judge then gave the following charge:

> "Mr. Foreman and members of the jury, I've received your note stating that you have a hung jury and asking if there is anything that I could suggest that may help you. Well, all I can say is that in a large proportion of cases an absolute certainty cannot be expected. Although the *verdict*

---

**2.** Appellant contends that the note cited the numerical results of the balloting, but we are precluded from considering anything not in the record. Green v. State, *supra,* n.1.

*must be the verdict of each individual juror* and not a mere acquiescence at the conclusion of your fellows, yet you should examine the question submitted with candor, and *with proper regard in deference to the opinions of each other*. It is your duty to decide the case, if you can conscientiously do so. You should listen to each other's arguments with a disposition to be convinced if much the larger number of jurors are for conviction, the dissenting juror should consider whether his doubt is a reasonable one which makes no impression upon the minds of so many jurors equally honest, equally intelligent with himself. If, upon the other hand, the majority are for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of. a judgment which is not concurred in by the majority. Are there any other questions while you're in the courtroom? I suggest that you go back and consider for a while longer. If you are hopelessly deadlocked, just let me know. Anything else? (no response) Alright, you may retire to the jury room. (Jury retires once again, and reaches a verdict)" (Emphasis added).

The jury returned approximately one hour and fifteen minutes later with the guilty verdict.

The appellant contends that this personalized version of the *Allen* Charge [3] was clearly coercive. Although this charge met with no objection at the trial level we have held that an erroneous *Allen*-type instruction amounts to plain error under Md. Rule 756 g and should be examined. *Pinder v. State*, 31 Md. App. 126, 355 A. 2d 489 (1976); *Fletcher v. State*, 8 Md. App. 153, 258 A. 2d 781 (1969).

As pointed out in *Leupen v. Lackey*, 248 Md. 19, 25, 234 A. 2d 573 (1967), there are many facts and circumstances in each case which may make an *Allen*-type charge either

---

[3]. The name is taken from Allen v. United States, 164 U. S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896).

inadvisable or require great care and restraint in presenting it to the jury. Since the trial judge is obviously in the best position to judge these circumstances, when to employ this charge and what words should be selected are matters best left to his sound discretion. *Kelly v. State*, 270 Md. 139, 310 A. 2d 538 (1973), affirming 16 Md. App. 533, 298 A. 2d 470 (1973).

In *Kelly, supra* at 144, the Court of Appeals stated:

"After the jury has been sequestered to deliberate, we think it advisable that a trial judge, who decides to give an *Allen*-type charge because of an apparent deadlock, should closely adhere to the wording of the ABA recommended instruction. If he does not, the language selected will be subjected to careful scrutiny in order for it to be determined whether the province of the jury has been invaded and the verdict unduly coerced. In addition, as ample time for discussion and consideration of the issues should be allowed before such a charge is given or repeated, the interval from the onset of deliberation, in view of the complexity of the case, will be considered in examining whether there was an abuse of discretion in giving the instruction at the time the trial judge selected."

In the instant case there was no abuse of discretion in the timing of the instruction, since three hours was certainly ample time for discussion and consideration. We must now therefore examine the instructions to determine if there was undue coercion. We find *Burnette v. State*, 32 Md. App. 277, 360 A. 2d 23 (1976), *cert. granted* October 26, 1976, to be dispositive of the issue. The instructions in that case were virtually identical to those in the instant case. We held that a charge given after the jury has retired should no longer be given which does not conform to the ABA standards, but the failure to give such a charge will not always necessarily amount to reversible error. The variance in the case at bar and *Burnette, supra*, was neither as great or coercive as *Pinder, supra*. While the language concerning the

considerations which a minority juror should adopt again meets with our express disapproval, the charge, when considered in its entirety was not such a flagrant deviation from the ABA approved *Allen*-type charge as to constitute reversible error. *Burnette, supra* at 282.

*Judgment affirmed.*
*Appellant to pay the costs.*