752 A.2d 1227

Steven Blair JACKSON

v.

STATE of Maryland.

No. 1529, Sept. Term, 1999.

Court of Special Appeals of Maryland.

June 6, 2000.

470

John M. Hassett, Baltimore, for appellant.

Shannon E. Avery, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore and Frank Weathersbee, State's Attorney for Anne Arundel County, Annapolis, on the brief), for appellee.

Argued before WENNER, DAVIS and KENNEY, JJ.

KENNEY, Judge.

## PROCEEDINGS

Appellant, Steven Blair Jackson, was charged with two counts of second degree rape, two counts of second degree assault, and other lesser included offenses. A suppression hearing was held on January 25, 1999, to suppress evidence seized during the execution of a search warrant. The Circuit Court for Anne Arundel County denied this motion. A motion for reconsideration was also denied. Appellant was convicted at a jury trial of two counts of second degree rape and two counts of second degree assault. He was sentenced to two twenty-year terms of imprisonment, to be served consecutively. Appellant filed a timely notice of appeal, presenting the following questions, which we have reworded as follows:

I. Did the trial court err in declining to suppress evidence seized during the execution of the search warrant?

II. Did the trial court err in prohibiting expert testimony concerning the effect of bleach on the victim's vaginal area?

III. Did the trial court err in admitting evidence of prior bad acts and refusing to give the jury a precautionary instruction?

## FACTS

In June 1998, the victim, a 19 year old college freshman, was leaving a local Baltimore bar when she met appellant riding a horse outside of the bar. She approached appellant, expressing an interest in horses. The two exchanged telephone numbers and discussed the possibility of horseback riding together sometime in the future.

On June 24, 1998, the two spoke on the telephone about arranging a time to go horseback riding. She met appellant at Marley Station Mall and followed him in her car to the National Fitness gym, which he operated. Inside the gym, she changed into riding clothes.

She and appellant left the gym in his car and drove to appellant's stables. They then saddled two horses and went riding on a wooded trail. After approximately a twenty minute ride, it was getting dark and the two went into a small bar for a few drinks. She and appellant remained at the bar drinking until approximately 11:00 p.m. During this time, she consumed three beers, a lemon drop shooter, and tasted another shooter. She took a fourth beer with her when the two left the bar. While at the bar, she left twice to go to the restroom, leaving appellant alone with the bartender. During their conversations at the bar, she informed appellant that she was studying criminal justice. He responded that "he had been arrested before."

The victim testified that the next thing she remembered after she left the bar was that she and appellant were back at the stables. She remembered that she was nude and "he was having sex with me." She attempted to stand up, but stumbled and fell. She then began to vomit. She recalled him picking her up and putting her in a car. As they were riding in appellant's car, she tried to climb out the window, still nude, and he pulled her back in the car.

She next remembered being back at the gym, waking up in a bed, and realizing that appellant again was having sex with her. The bed was in a mirrored room that was part of the gym that she had not seen before. At some point during the

night, appellant stated, "have you figured out what I have been arrested for?" Appellant helped her to her car, and she drove to her home in Ellicott City. She arrived at her home around 6:00 a.m. Once at home, she felt "awful," but showered and went to work. While showering, she noticed several bruises on her body.

The following day, June 25, she told her mother she thought she had been raped. Her mother took her to the Howard County Hospital, where the victim recounted her story to several Howard County police officers. While at the hospital, she saw Dr. Michael Perline. Dr. Perline noted that she was tearful and frustrated, but did not observe any injuries on her. A rape examination was not conducted because the incident did not occur in Howard County, and it was the hospital's policy to refer people to the county in which the incident occurred.

On June 27, 1998, the victim went to the Anne Arundel County authorities to report her story. She testified that after returning home she felt better. She stated that, "I was cleaning myself and ... cleaning down there, and I felt something hard." She removed the object, which she determined to be a plastic cap. She gave the cap to the police.

Detective Kathy Pleasant and Detective Katherine Goodwin, Anne Arundel County police officers assigned to the Sex Offense Unit, testified at the suppression hearing that the victim had informed them that she was raped by appellant in a back room at National Fitness. The police drove her to the Sun Valley Shopping Center, where she identified the National Fitness gym as the location where the last incident occurred.

On July 2, 1998, police confirmed that the address of National Fitness was 7963 Baltimore–Annapolis Boulevard. They checked the county dispatch system, the phone book, and land records. There was no distinction on the land records of a separate address of 7959A Baltimore–Annapolis Boulevard. They also consulted a police officer who had, six years earlier, worked out at the gym, and confirmed the

address. They also spoke with an officer's wife who formerly taught aerobics at the gym and were informed that the aerobics room was no longer used for aerobics, but was used for storage. Detective Pleasant testified that after discussions with the victim and the other individuals, she concluded that appellant might be living or sleeping at National Fitness. A warrant was issued to search the location of 7963 Baltimore–Annapolis Boulevard and seize evidence including: bed sheets or bedding, sex toys, occupancy documents, and pill bottles.

Detective Pleasant, along with other officers, went to National Fitness to execute the warrant. They went directly to the front desk and asked to speak with appellant. While Detective Pleasant was speaking with appellant, the other officers were securing the premises. Detective Goodwin approached appellant, informing him that doors in the back of the gym were locked. Appellant stated that the area was storage and gave Detective Pleasant the keys to the doors. The receptionist informed the officers that the doors in the back were locked and that "there was a bunch of stuff on the other side" and that "it would be easier to go around." The officers then went out the front door and, using the keys, entered a door marked 7959A, which they were told was the storage area. Detective Pleasant had a photograph taken the day of the search that indicated the separate address, but testified that at the time of the search she did not notice a separate address.

The room appeared to be an aerobics room with walled mirrors and "cushy" flooring, now used to store old exercise equipment, boxes, and promotional materials. Inside the room, they discovered what appeared to be appellant's bedroom area. From the area, they recovered an empty pill bottle, a bleach bottle, sex toys, photographs, and other documents, which were later entered as evidence against appellant.

The theory of the prosecution's case was that appellant drugged the victim's drinks and raped her. Appellant, on the other hand, contended that the parties engaged in consensual sex.

Appellant testified at the suppression hearing concerning the aerobics room. He stated that interior doors no longer connected the gym to the aerobics/storage area. Although the area had previously been part of the gym, fire codes required a firewall to be built between the two areas and the only access was through the front. He slept in the area, but the phone line was registered to the National Fitness 7963 address, and his mail was delivered to the National Fitness 7963 address.

The trial court denied appellant's motion to suppress evidence seized from this aerobics/storage area. The trial court stated:

> Now in this case, it is all the same, really, because—just because it has another number up there, it is part of the same area. He is sleeping there. He shows his MVA, the records, that he even lists his license at the number that was—that they used for the warrant. The keys, if they have the keys, they could go right into it. Under all the circumstances, the court is going to deny your motion to suppress.

## DISCUSSION

### I. Suppression Hearing

■ Appellant asserts that the trial court erred in denying his motion to suppress. He argues that, although the warrant was valid, its execution was improper. He asserts that the bedroom area, because it had a designated street number, was a separate address, and therefore the police officers went outside the scope of the warrant in searching the separate locked area. He argues that, upon realizing the warrant was not broad enough, the police officers took it upon themselves "to extend the authorization [of the warrant] to a location next door." We disagree.

■ In reviewing a denial of a motion to suppress, this Court reviews only the record of the suppression hearing, reviewing the evidence in a light most favorable to the State

as the prevailing party. *Williams v. State*, 127 Md.App. 208, 732 A.2d 376 (1999). We accept the factual findings of the trial court, unless clearly erroneous, but make our own independent constitutional appraisal of legal conclusions. *Ferris v. State*, 355 Md. 356, 735 A.2d 491(1999).

In *Ferguson and Crenshaw v. State*, 236 Md. 148, 202 A.2d 758 (1964), the Court of Appeals was confronted with a similar situation of a business with multiple buildings. The police had a warrant to search the premises known as Central Battery Service, located at 1301 E. Baltimore Street. Central Battery Service was a tire, battery, and repair shop located at the corner of Baltimore Street and South Central Avenue. The business consisted of several adjoining buildings, all owned by the same person and operated as part of Central Battery Service. The formal address of Central Battery Service was 1301 E. Baltimore Street, although the rear buildings, consisting of the battery and repair shops, faced South Central Avenue and were numbered 3, 5 and 7 S. Central Avenue. All the buildings were joined, except for the repair and battery shop which was connected by a small alleyway due to fire regulations. The buildings were painted the same, and all carried the logo "Central Battery Service."

In executing the warrant for 1301 E. Baltimore Street, the officers went to the rear buildings where the repair and battery shops were located. They arrested Crenshaw and searched the surrounding premises. As appellant argues here, Crenshaw argued that the search of the repair and battery shops was illegal, "since they have different addresses they must be treated as and considered to be separate and distinct locations."

The Court of Appeals found that the search of the buildings was proper as the buildings consisted of "one business establishment." The court relied on the fact that all the buildings were owned and operated by one person, were all the same color, were all adjacent to one another, and the fact that Central Battery Service listed its address as 1301 E. Baltimore Street "even though it encompasses a larger area than

the specific piece of property with that address." The Court found that "the description in the warrant is sufficient to authorize a search of the entire premises despite what the land records show is the ownership of the property."

This case presents somewhat similar circumstances. The disputed area once housed gym activities and is currently being used to store gym equipment. Its separation by a fire wall was imposed by a building code regulation. The area is owned by the same individual. The area contains National Fitness phone lines and continues to serve a gym function, i.e., storage of gym equipment. In addition, it remains equipped to house gym activities if necessary. Other than the different address on the exterior doorway, there is nothing to suggest that this area was not part of the 7963 property. In fact, appellant listed 7963 Baltimore–Annapolis Boulevard as his address on official MVA records and has his mail sent to the 7963 gym address. We find that although the now separate storage area may have a separate street number, it sufficiently remained part of the same "business establishment" to be included in the search of 7963 Baltimore–Annapolis Boulevard.

█ Even if the premises were to be considered a separate address and not part of the National Fitness gym, the officers had a reasonable, good faith belief that they were searching the gym area, and therefore that the search was proper. Both parties cite *Maryland v. Garrison*, 480 U.S. 79, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987), for the "good faith exception" to the warrant requirement. In *Garrison*, the officers received a warrant to search the third floor of 2036 Park Avenue and, based on utility company records, the officers believed that only one apartment was located on the third floor. Upon entry, the police detained the suspect, Lawrence McWebb, and used his key to gain entry to the third floor of the house. The police seized evidence of narcotics and drug paraphernalia from the apartment, but soon realized that they were in a second apartment located on the third floor, which belonged to Harold Garrison, and stopped the search. The seized evi-

dence was later used to convict Harold Garrison on drug charges.

In upholding the search of Garrison's apartment, the Supreme Court discussed two constitutional issues, first finding that the warrant was valid and then discussing the reasonableness of the manner in which it was executed. Noting that searches are limited in scope based on the purpose justifying the search, the Court stated that "the Court has also recognized the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing warrants." *Garrison*, 480 U.S. at 87, 107 S.Ct. 1013. The Court concluded that the officers acted in a reasonable manner and the search was proper. The Court found that "the objective facts available to the officers at the time suggested no distinction between McWebb's apartment and the third-floor premises." *Garrison*, 480 U.S. at 88, 107 S.Ct. 1013. The Court noted that nothing McWebb did or said would have suggested that there were two apartments on the third floor. In fact, McWebb provided the officers the key to both the first floor entry and the third floor, leading the officers to believe they were entering an undivided apartment on the third floor. *Garrison*, 480 U.S. at 88 n. 12, 107 S.Ct. 1013.

Similar to *Garrison*, we find that the officers in the present case acted reasonably in searching the aerobics/storage area. Appellant asserts that, "after searching 7963 and failing to locate a bedroom, the police knew they either had a misinformed witness or they were searching the wrong area." We find, however, that the police had a reasonable basis for believing the storage area was part of the gym.

First, the officers observed interior locked double doors. Upon inquiry, appellant informed the officers that the doors went to a storage area. Further, the officers testified that appellant provided them with the keys to the area, and it was the receptionist who suggested easier access from the outside. Upon entry, the officers found old gym equipment and promotional material in what appeared to be an aerobics room.

There is no evidence that during the search appellant claimed the storage area was not part of the gym, or that it was a private residence. Detective Pleasant testified that, at the time of the search, she did not notice that the area had a separate address. The officers, acting on the witness's statements, knew they were looking for a "back area" that had mirrored walls, akin to an aerobics room. We believe the officers had a good faith belief that they were searching part of the gym, and not a separate address.

## II. Expert Testimony

■ Appellant asserts that the trial court erred in not allowing Dr. Michael Perline, a witness for the State, to be cross-examined concerning the effects of bleach on the vaginal area of a 19 year old woman. Appellant argues that the State, during closing argument, "offered a devastating theory regarding the bleach" by asserting that bleach was used on the victim's vaginal area to thwart DNA testing. He concludes that the trial court failed to permit expert testimony on the issue and committed an abuse of discretion and reversible error. We disagree.

During trial, the State called Dr. Perline, the Howard County physician who met with the victim at the hospital. On direct examination, Dr. Perline testified regarding the victim's outward condition during her visit and explained why a rape examination was not conducted. Dr. Perline did not testify regarding DNA testing, nor was there any mention of bleach during his direct examination. On cross-examination appellant asked Dr. Perline: "[D]o you have an opinion, sir, based upon reasonable medical certainty, what Clorox bleach would do to the vaginal area of a 19 year old woman?" At that time, the State objected and the following bench conference followed:

State: Beyond the scope, Your Honor—

Defense: Technically, that is correct, Your Honor. If I am obliged to ask the doctor to come back again, you know, I don't mind doing it. It is somewhat of an imposition.

State: I would further suggest that it would be some type of expert testimony. I haven't been advised of any—that type of testimony and I don't think it would be expert. He is asking him to give an expert opinion which I have not been advised of in advance, so obviously, that wouldn't be admissible either.

Defense: The answer to that is, it is her witness, not mine.

State: Well, my witness is done now, though.

Court: All right, I sustain the objection.

The objection was sustained and Dr. Perline did not testify as to the effects of bleach on the vaginal area.

Appellant argues that the trial court failed to make the requisite findings under Rule 5–702 for the testimony of experts.[1] The basis of the trial court's ruling, however, was not that the solicited testimony was irrelevant or that Dr. Perline was not qualified to form an opinion on the subject, but that the question went beyond the subject matter of direct examination. Rule 5–611.[2]

"Maryland follows the prevailing American practice of generally limiting cross-examination to the subject matter of the direct examination and matters affecting the credibility of the witness. Under this rule, counsel always may cross-examine an opponent's witness in order to impeach the wit-

---

1. Rule 5–702 provides:

 Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

2. Rule 5–611(b)(1) provides, in part:

 [C]ross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. Except for the cross-examination of an accused who testifies on a preliminary matter, the court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination.

ness, but is entitled to ask substantive questions on cross only in the course of further inquiry into the points brought up on that witness'[s] direct examination." McLain, MARYLAND EVIDENCE, § 611.1 (1987). "Generally, cross-examination is restricted to those points on which the witness had testified on direct examination. This rule is not applied to limit cross examination of the witness to specific details brought out on direct examination 'but permits full inquiry of the subject matter.'" *Hickey v. Kendall,* 111 Md.App. 577, 615, 683 A.2d 789 (1996), *aff'd sub nom.,* 348 Md. 157, 702 A.2d 767 (1997)(quoting *Dove v. State,* 33 Md.App. 601, 606, 365 A.2d 1009 (1976), *rev'd on other grounds,* 280 Md. 730, 371 A.2d 1104 (1977)). *See also Colvin-el v. State,* 332 Md. 144, 169, 630 A.2d 725 (1993), *cert. denied,* 512 U.S. 1227, 114 S.Ct. 2725, 129 L.Ed.2d 849 (1994); *Thomas v. State,* 301 Md. 294, 308, 483 A.2d 6, 13 (1984), *cert. denied,* 470 U.S. 1088, 105 S.Ct. 1856, 85 L.Ed.2d 153 (1985); *Tirado v. State,* 95 Md.App. 536, 555, 622 A.2d 187, *cert. denied,* 331 Md. 481, 628 A.2d 1067 (1993). "The scope of cross-examination is within the sound discretion of the trial court and ordinarily will not be disturbed unless there is an abuse of discretion." *Simpson v. State,* 121 Md.App. 263, 283, 708 A.2d 1126 (1998).

In questioning Dr. Perline about the effects of bleach, appellant went outside the subject matter of direct examination. Dr. Perline testified on direct examination only about his meeting with the victim, her outward appearance, and the failure to conduct the rape examination. He did not testify to any specific details of rape examinations or DNA testing. Although he is a physician, he offered no medical testimony or opinion on direct examination.

Appellant's inquiry was not related to the subject matter of Dr. Perline's direct testimony. Moreover, appellant sought to solicit from him an expert opinion, even though Dr. Perline had not been offered or accepted as an expert by either the State or appellant. Therefore, the trial court's ruling was proper and Rule 5–702 did not apply.

 Appellant cites other examples of the State's bleach theory that occurred later in the trial. He first cites the testimony of Catherine Braunstein and Meredith Monroe, forensic chemists, regarding the use of bleach as a cleaning agent in the laboratory to destroy DNA samples. Catherine Braunstein was asked by the State:

Q: Why is bleach used?

A: Bleach helps break down DNA and make it no longer amplifiable for the PCR portion of the test that we use.

Q: So if bleach breaks down DNA, how does it affect testing?

A: If DNA is broken down enough, then we won't get any kind of result.

Meredith Monroe was asked:

Q: Okay. Now, going back to the precautions that you take in the lab, is the lab—is it cleaned in any way? Or what do you do to keep the lab clean?

A: In between victim and suspect samples, as well as different cases, we clean our benches with a 10 percent bleach solution.

Q: Why bleach?

A: Bleach debilitates the DNA and makes it inactive. It breaks it down into tiny pieces.

Appellant then argues that, during closing argument, the State suggested the "devastating theory" that appellant "used bleach on [the victim's] vaginal area." Appellant concludes that "the trial court believed the issue concerning the bleach to be relevant and worthy of consideration by the jury" and that, when he attempted to approach the subject, the trial court prohibited him from presenting testimony "that would have conclusively established the merit or fallacy of the theory of the use of the bleach," and abused its discretion. Again, we disagree.

Appellant is correct that during direct examination the State questioned both chemists regarding the cleaning methods of the laboratory and raised the issue during closing

argument, but the chemists testified after Dr. Perline. Appellant made no objection to their testimony and, in fact, made no effort, other than during his earlier cross-examination of Dr. Perline, to solicit any testimony regarding the effects of bleach on the vaginal area of a 19 year old woman. He did not proffer any testimony, recall Dr. Perline, or call any expert witnesses on his behalf. We find no abuse of discretion.

### III. Character Evidence

Appellant asserts "two-fold reversible error" by the trial court when it admitted statements of bad character and then failed to give a limiting jury instruction regarding the use of such statements. He argues the trial court erred by allowing the victim to testify that appellant had been arrested before and that he stated "have you figured out what I have been arrested for," because these statements constituted bad character evidence, prohibited under Rule 5–404(b).

Prior to trial, appellant made a motion in limine seeking to exclude both statements as well as a prior 1994 second degree rape conviction. The trial court found that the statements constituted an admission against interest by the defendant, but found that although prior convictions for similar offenses are not automatically excluded, the probative value of appellant's prior rape conviction was outweighed by its prejudicial effect. The trial court excluded evidence of the conviction.

At trial, the victim testified as follows:

Q: Okay. Tell us what kind of things you were talking about.

A: All kinds of things like his family. He was telling me that he had all kinds of money and he told me—he was asking me about the Army and I was telling him what I was doing, and then he told me that, when the criminal justice concentration came up, he told me that actually he had been arrested before.

Defense: Objection.

Court: Overruled. Continue.

Q: Okay ... He told you he had been arrested before and how did that make you feel at that point?

A: I got a little bit nervous but I thought—I have a lot of friends who get arrested for—who have been arrested for fights and actually they like to brag about it and stuff and so I kind of thought maybe that's what it was.

Later, she testified:

Q: [Y]ou indicated at some point that the defendant was laughing at you when you were at the gym or outside the gym. Do you recall anything that he said to you at that point?

A: I remember he said to me, I—he said—I remember—I'm not sure if it was at that point. I don't want to say that it was at that point.

Q: Okay.

A: But I remember him saying to me, as a part of this, I remember him saying, have you figured out what I have been arrested for?

Q: Okay.

Defense: Objection, Your Honor.

Court: Overruled.

Appellant argues, on appeal, that the purpose of the first statement, that he had been arrested before, and the following question about how that made the victim feel "was not to establish proof of motive, opportunity, intent, preparation or other expression under Maryland Rule 5–404(b), but to prove the character of the appellant which is prohibited under the rule." He argues that, after he denied making the first statement, the State never questioned him during trial concerning the second statement, and the State improperly emphasized this point during closing argument, and used the statements "solely to establish the bad character of appellant."

■ While, generally, evidence of a defendant's prior bad acts is inadmissible, Rule 5–404(b) recognizes situations in which evidence of prior criminal or wrongful acts may be admitted. Rule 5–404(b) sets forth a non-exhaustive list of

special circumstances. *Streater v. State,* 352 Md. 800, 809, 724 A.2d 111 (1999). Rule 5–404(b) provides:

(b) *Other Crimes, Wrongs, or Acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

The Court of Appeals has held "that consciousness of guilt is an 'other purpose' that will overcome the presumption of exclusion that is attached to 'other crimes' evidence." *Conyers v. State,* 345 Md. 525, 554, 693 A.2d 781 (1997), *cert. denied,* —— U.S. ——, 120 S.Ct. 258, 145 L.Ed.2d 216 (1999)(citing *State v. Edison,* 318 Md. 541, 548, 569 A.2d 657, 660 (1990)).

Appellant seeks to differentiate his statement from that found admissible in *State v. Brown,* 327 Md. 81, 607 A.2d 923 (1992). In *Brown,* the State sought to introduce the statement, "It's not that you're not okay, I just don't deal with anybody new," as evidence against the defendant. The Court of Appeals held that the statement was properly admitted, as it was probative of how the defendant conducted his drug business, and that it was an admission of a party opponent. The Court viewed the statement not simply as "other crimes" evidence, but as an admission about the manner in which Brown acted when carrying out his drug business.

Although appellant seeks to distinguish *Brown,* which he characterizes as being "clear, convincing, and uncomplicated," we find *Brown* instructive. As stated in *Brown,* an admission is "a statement of pertinent facts which, in connection with proof of other facts, tends to prove guilt." *Brown,* 327 Md. at 88, 607 A.2d 923 (quoting *Holland v. State,* 244 Md. 671, 673, 224 A.2d 864, 865 (1966)).

The admission of other crimes evidence is vested within the sound discretion of the trial court and we will not overrule the decision of the trial court unless there has been

an abuse of discretion. *Merzbacher v. State,* 346 Md. 391, 404, 697 A.2d 432 (1997). Under the circumstances in which appellant made the statements, and the statements taken together, we find that the statements were properly admitted as they tended to show a consciousness of guilt. We, therefore, find no error in admitting the evidence.

Appellant also asserts that the trial court erred in failing to instruct the jury on the limited use of other crimes evidence. "In reviewing the propriety of a trial court's denial of a requested jury instruction, we must examine 'whether the requested instruction was a correct exposition of the law, whether that law was applicable in light of the evidence before the jury, and finally whether the substance of the requested instruction was fairly covered by the instruction actually given.'" *Farley v. Allstate Ins. Co.* 355 Md. 34, 47, 733 A.2d 1014 (1999) (quoting *Wegad v. Howard Street Jewelers, Inc.,* 326 Md. 409, 414, 605 A.2d 123, 126 (1992)); see also, *Tharp v. State,* 129 Md.App. 319, 742 A.2d 6 (1999).

At trial, appellant requested that Maryland Pattern Jury Instruction, Criminal ("MPJI Cr") 3:22,[3] impeachment by prior conviction, be given to the jury. Defense counsel argued:

I think that the jury should be told, Your Honor, that they may not find him guilty because this apparent admission of having been in jail before. . . .

The question is what guidance, Your Honor, do we give the jury as to what to do with that information? Can they say, well, he has been in jail before, and therefore, I am going to find him guilty in this case.

The trial court refused to give the instruction, stating:

Again, as you know, the Court permitted the complainant to testify to a statement made to her solely for purposes of

---

**3.** MPJI Cr 3:22 provides:

3:22 Impeachment by Prior Conviction

You have heard evidence that the defendant has been convicted of a crime. You may consider this evidence in deciding whether the defendant is telling the truth, but for no other purpose. You must not use the conviction as any evidence that the defendant committed the crime charged in this case.

credibility and intent, and the Court, as you know, made a ruling with regard to impeachment by prior conviction whereby I did not permit the Defendant's prior record to come into evidence.

Although we agree that appellant's requested instruction would be proper if the prior conviction evidence was offered to impeach his testimony, the instruction was not applicable under the circumstances. As we stated above, the trial court allowed the victim to testify as to general statements appellant made about prior arrests and about his second statement from which one could speculate on what grounds he was arrested. The statements were offered, however, as an admission against interest or evidence that tended to prove guilt, permitted under the "other purpose" exception to the general exclusion. The trial court explicitly stated that appellant's past criminal record was not to come into evidence for impeachment purposes, as it was highly prejudicial. Thus, appellant's prior rape conviction in 1994 was not entered into evidence, and it was not used to impeach his testimony. We therefore find no error in the trial court's refusal to give the jury the instruction on impeachment by prior convictions.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**