## GEORGE EDWARD RICE *v.* STATE OF MARYLAND

[No. 375, September Term, 1969.]

*Decided June 24, 1970.*

554

The cause was argued before Murphy, C.J., and Anderson, Morton, Orth, and Thompson, JJ.

*Gerald A. Smith* for appellant.

*John J. Garrity, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *Michael E. Kaminkow, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

Thompson, J., delivered the opinion of the Court.

George Edward Rice, the appellant, was tried in the Criminal Court of Baltimore before Judge Albert L. Sklar, without a jury. He was found guilty of kidnap-

ping (Indictment No. 6473) ; of rape (Indictment No. 6470) ; of unnatural and perverted sexual practice (Indictment No. 6472) ; of burglary (Indictment No. 6474) ; and of unlawfully and knowingly photographing obscene matter (Indictment No. 6475). He was given varying concurrent sentences, the two longest being fifteen years.

The prosecutrix, a 5' 8", 135 pound, 22 year old art student, resided alone in Baltimore in one of two third floor apartments at 1500 Mt. Royal Avenue. Appellant, Rice, 6' 4", 215 pounds, lived at 607 Resevoir Street, about six blocks from the prosecutrix's apartment.

Rice testified that while coming home at about 1:45 a.m. on October 13, 1968, from a dance he stopped to buy a six-pack of beer, after which he was approached by a man "dressed like a hippie" who asked him for a match and then asked if he was looking for any "happening". This man told the appellant that he had "a couple of girls working for him." Rice testified that since he was "going home to an empty bed anyway. . . he said okay to the man", and that they walked to 1500 Mt. Royal Avenue. On the second floor, the man asked appellant to "let me see your bread [money]." Rice put his beer down beside a duffel bag that was there, gave the man ten dollars, was told to go to the third floor and tell the girl "Bobby" sent him.

According to the prosecutrix, she was sleeping in the nude on her mattress on the floor (she had no bed) when she was awakened by a knock on the door at approximately 2:00 a.m. She picked up her fur coat which she kept on the floor next to her mattress and used as a bed for her cats. The coat came almost to her knees but since it did not have buttons, she wrapped it around her. "I was asleep in my apartment and somebody knocked on the door. And I went to answer the door and I opened the door a little bit to see who it was and then I realized it was this man I had never seen before. So then I tried to close the door again, but then he was putting pressure to the other side of the door and broke in. . . . Well as he entered, when I realized he was going to enter the

apartment because I couldn't close him out, I started screaming. . . . Then he put his hand over my mouth and put pressure on me. I was on the floor and he was rendering me incapable of moving." She testified that Rice then said "Why did you scream?" The prosecutrix did not remember answering the question but recalled appellant asking her if she "knew this certain man." She did not recall the name suggested. Apparently Rice had only briefly held her because she testified he then said "that he wanted to go to the bathroom. But then he went into the bedroom instead which is my living room." She continued, "So then when he was walking ahead of me I thought, knowing my chance to try to get out, so I ran to the door but then he ran up and closed the door so I couldn't get out." She further testified, "so then he started putting me on the bed" and "he just either took my coat off or said to me to take my coat off." Either way, her coat was removed, and Rice got on top of her. She testified, before anything happened, the phone rang and she answered it. It was Mr. Kay, a neighbor who, having heard her scream, called to inquire if there was trouble. She said that she answered affirmatively and that she answered affirmatively to his question of whether she wanted the police called.[1] When she hung up, Rice asked her to find his shoes while "he put his clothes on." After the victim donned only the fur coat and a pair of tennis shoes, Rice opened the apartment door and they proceeded to his apartment, according to Miss Wilkinson, walking side by side with his hand looped around her shoulder and the back of her neck. About three blocks from Miss Wilkinson's apartment, the parties were seen by Stephen Kieth, who was about 50 feet away. Miss Wilkinson testified that at this point she made an attempt to signal Kieth for help beckoning to him with her hand. Kieth testified that when he approached them, they began going up the alley at a faster rate and he picked up

1. The testimony showed a police officer arrived after Rice and the victim left the apartment.

a rock and gestured to throw it at Rice. By this time Miss Wilkinson and Rice had begun to run and she fell to the pavement, skinning herself. Kieth didn't know how she fell, but he said that Rice helped her up after throwing a rock at Kieth. Miss Wilkinson testified that then Rice dragged her up the alley by the hair, causing her to lose her tennis shoes in the alley. At his apartment, Miss Wilkinson asked for a drink of water, but Rice was busy asking her why she had screamed outside; she testified that instead of giving her a drink of water, he said, "before I give you a drink why don't you drink this stuff here" which she said was a "bottle of booze". When she had taken some liquor, Rice gave her a glass of water. After this, appellant told her to take her coat off, leaving her nude. Rice then took her into the bedroom. She testified that the appellant then took from his dresser what looked like a movie camera with a bright light on it and told her to "walk back and forth in front of the camera and smile," and to open some drawers in the dresser. Then Rice asked her to sit on the bed and open her legs and to masturbate. She testified that next "he came along side of me while I was sitting on the bed and told me to suck his thing." She complied with his requests without visible objection but testified she was "real scared." Afterwards she had sexual relations with the appellant on his bed explaining, "It was just an ordinary intercourse." She later testified that she was not a virgin. She said, "Well, he kept repeating, it was a pattern. First it was showing the movies while I was sucking his thing, then he'd have sex. At the same time he was playing this music on the radio." She said that she had intercourse with him "roughly four times or five or six or seven", and that she performed fellatio upon him "every time before sex." She explained that in her view, resistance "would have taken me a longer time to get out of the situation because violence intimidates me", and that she thought "the best way to get out of this was to start to pretend that I was his friend."

She testified that at one point she heard a knock on

the door but continued, "I don't remember whether I had intercourse with him before the knock came on the door or not." Appellant went to the door without leaving her sight but she could not hear the conversation. When appellant returned to the bed after a few minutes, she asked "who it was and he said 'it was your hippie friends, coming to rescue you and the police,'" after which she testified as follows:

"Q. Then what did he say?

"A. Then he said 'The police can't come in because they don't have a search warrant'.

"Q. After he told you that, what was your mental state upon hearing that?

"A. Well I was really disgusted. I was really, felt like nothing could get me out of that situation. Then I was scared at the same time.

"Q. Did you see any police at this time?

"A. Well the only thing I saw was, you know, police cars had this light on top of their car.

"Q. Uh huh.

"A. Well I saw that light going around out the window.

"Q. At that time did you scream at all?

"A. No.

"Q. Why did you not scream?

"A. Because I thought even if I screamed they still couldn't get in because they didn't have the search warrant. I wasn't familiar with the law if they heard me scream then they'd be allowed to come in.

"Q. Now you saw the lights. When did you see the lights, before or after the defendant came back from the door?

"A. After."

After the police had gone, they apparently had intercourse several times. After giving her a drink of water, Rice set his alarm clock for 6:00 a.m. The couple then went to bed and Rice fell asleep. Miss Wilkinson testi-

fied that after a few minutes, she got up to go to the bathroom but when Rice woke up, she went back to the bed and sat there next to Rice while he slept until the alarm went off, at which time she turned off the alarm and asked him if she could go. Rice then provided her with clothes and walked her home. As they were climbing the stairs to her apartment, they passed a soldier sitting on the steps next to a duffel bag. The soldier testified that Miss Wilkinson and Rice "were conversing in a friendly manner, you know, as if they had known each other", and in a few minutes he saw Rice leaving her apartment and say to her, "Take it easy." Rice, coming downstairs, saw his beer on the soldier's duffel bag and told the soldier that it belonged to him. The soldier let Rice have the beer.

Miss Wilkinson testified that a few minutes after returning home with Rice and after he had gone, she changed her clothes and went next door to tell her neighbor, Jerry Kay, and his wife about what happened. Kay, a medical student, treated her abraded knee and wrist. She called the police on the advice of her friends but upon being told that the police could not control the context of the newspaper report of the incident, she directed them not to pursue the complaint. She testified she did not want her parents to know about it because her father had Hodgkin's disease. About five hours after the incident, Miss Wilkinson changed her mind and decided to report the incident to the police. George Rice was subsequently arrested and his house searched under authorization of a search warrant directing the seizure of "movie cameras, lights, pornographic film, processed and unprocessed." During the course of the search, police removed from a storage space under the couch an envelope bearing the name George Rice and containing 23 color and black and white snapshots of Rice and an unidentified girl either separate or together in various nude poses. The pictures were admitted into evidence without objection. There were no pictures showing the prosecutrix.

The several contentions will be set out separately.

I

"Given the conduct of the prosecutrix and the absence of any force, violence or threats by George Edward Rice in having intercourse with the prosecutrix, the rape conviction was erroneous as a matter of law."

The State relies on *Hazel v. State,* 221 Md. 464, 157 A. 2d 922 which we recently reviewed with some care in *Walter v. State,* 9 Md. App. 385, 264 A. 2d 882.

In *Hazel* the contention was made the victim did not resist at the actual time of the intercourse, but after citing the difference between submission and consent, the Court found there were sufficient threats of violence prior thereto to justify the trial court's finding that rape had occurred. In *Walter* we found the victim's fear of policemen was sufficient, under the circumstances, to support the trial court's finding that the victim submitted to the intercourse only through fear.

The appellant relies on several Illinois cases, *People v. DeFrates,* 33 Ill. 2d 190, 210 N.E.2d 467; *People v. Qualls,* 21 Ill. 2d 252, 171 N.E.2d 612; *People v. Helton,* 245 N.E.2d 1 which, while recognizing the rule a woman need not resist an unwanted sexual relationship if she is reasonably in fear of her safety, apply the rule most strictly and, in our opinion, are thus too narrow in requiring physical resistance by the victim. We do not think sound public policy requires a woman to resist to the extent that she runs a substantial risk of grievous bodily harm. The sounder test is whether the act was performed with or without the consent of the prosecuting witness. Where, as here, a woman submits to a stranger who has forced his way into her home and manhandled her, we do not look upon the case with the same eye as when intercourse occurs after an initially friendly encounter. This will distinguish other cases relied on by the appellant. *State v. Dill,* 40 A. 2d 443 (Del. 1944); *State v. Hoffman,* 280 N. W. 357 (Wis. 1938); *Selvage v. State,* 27 N.W.2d 636 (Neb. 1947). Nor do we think *Farrar v. United*

*States,* 275 F. 2d 868 (CADC 1959) particularly in point because in *Farrar,* conflicts on important matters within the prosecuting witness's testimony precluded reliance by the fact finder on her testimony. When there is evidence of a disposition to use force and the apparent ability to so do, the question of the amount of force required becomes a matter for the trier of the facts; this is the primary teaching of two other cases cited by appellant, *Deffenbaugh v. State,* 257 P. 27 (Ariz. 1927) and *State v. Thompson,* 40 S.E.2d 620 (N.C. 1946).

Maryland Rule 1086 directs this Court to affirm unless a trial judge's findings of facts are clearly erroneous. *Williams v. State,* 6 Md. App. 511, 252 A. 2d 262. After carefully reviewing each witness's testimony, Judge Sklar found:

> "It is not necessary in a rape case to have any corroboration for conviction if the story is believed by the Court or jury hearing it. In this case, however, there are many items of significant corroboration. Mr. Kay, who lives on the third floor was awakened by scuffling and a loud scream. He called by telephone Miss Wilkinson asking her if she was in trouble and did she need assistance. She indicated yes or affirmatively. And he called the police. That corroborates Miss Wilkinson's story about his forceful entry into her home. If the exit from the apartment was done in a friendly fashion, from Miss Wilkinson's apartment, that natural thing for Mr. Rice to have done was pick up his six pack of beer on the way home. That's only a passing thought, not particularly significant in itself. Another point of corroboration is the testimony of Stephen Kieth who was beckoned by Miss Wilkinson as Mr. Kieth said in a frantic motion. He came to her assistance, attempted to, was repelled by the actions of the defendant by the defendant throwing stones at him. Mr. Kieth

was yelling for somebody to get the police. The defendant pulled or pushed or dragged Miss Wilkinson away in an attempt to get away from Mr. Kieth. She fell and her knees were abraised, [sic] necessitating some cleansing treatment and attention by Mr. Kay, a medical student, the very next morning. Mr. Gibbons who lives on Mt. Royal Terrace in the back of his home where this was taking place, his attention was directed to the voices. He heard somebody yell 'Get the police', hearing a male voice. He went around, saw Mr. Kieth who told him what had happened. Thereupon they both went searching to try and find Miss Wilkinson. Officer Stuckrath coming to the apartment that early morning inquiring was refused admission of a search of the premises by Mr. Rice. Mr. Rice testified that Miss Wilkinson said if the police come in here I'll straighten them out. Yet they were not allowed in by Mr. Rice, so Miss Wilkinson could follow through on her promise if it did happen of straightening it out. The fact that an effort to get away from Mr. Kieth in the alley, being propelled rapidly and dragged in such a way to cause her to fall and lose her tennis shoes. Significantly they were found again later that same morning when coming back home. Almost immediately reporting of the complaint being made by Miss Wilkinson to Mr. Kay who called her that very morning offering to get help for her. The reporting of the complaint is significant and the time is significant. He treating her abrasions on her knees and so forth.

"Miss Wilkinson impressed this Court as being a rather curious mixture of sophistication and naivety. Sophisticated in many ways, naive in many ways and in her position as she stated that night having the fear of violence as she

stated she had, this being the first time she was exposed to it, she adopted the plan of going along with the defendant to protect herself and maybe in her own mind her life.

"Viewing it now in the cold light of this courtroom is one thing. Viewing it in the dark hours of the early morning by herself is quite another thing. She was apprehensive and stated several times she was frightened and scared. The camera which was used, or if it was used to take pictures is a significant thing. If an agreement was reached mutually to leave the apartment early in the morning, Miss Wilkinson's apartment to go to Mr. Rice's apartment, why such a hurry to let her go there undressed with only a fur coat on? On the way back he loaned her some pants and shoes. The defendant evidently liked to take pictures and the camera used that night or early morning, even though now in the possession of the defendant's girlfriend, was not brought into court as to what type of camera it was. I can't understand or make no comment why the camera wasn't taken at the time of the arrest. It was perfectly legal. The natural hesitation on the part of Miss Wilkinson about having the matter publicized so her parents would know about it is a natural reaction. A young girl would not want her parents to know about something like this having happened. This is understandable.

"It gets down now to the question of credibility, not only a question of credibility, it's one word against another. Then you have a matter purely of credibility. But Miss Wilkinson's testimony has been corroborated in many important details."

These findings satisfy the test of whether the prosecuting witness actually consented or merely submitted;

and we have no basis to say the findings were clearly erroneous under Maryland Rule 1086.

If the intercourse had occurred at the victim's apartment there would be no problem in finding the force used would reasonably justify the trial court's finding a lack of consent. The only real problem, on the facts as recited by the prosecutrix, in justifying the verdict is her failure to call to the police at the door, but her testimony, which was obviously accepted by the trier of the facts, was that she did not know the persons at the door were policemen until after they had departed and she accepted her abductor's statement that they could not enter without a search warrant and that she did not know they could have entered if she had screamed. While all this may be difficult for a sophisticated trier of facts to accept, it is not so preposterous that we can say the trial judge was clearly erroneous in accepting it.

## II Sufficiency of the Kidnapping Indictment

Rice contends that his indictment was insufficient in charging that he:

> "[F]eloniously did kidnap and make an assault upon a certain person, to wit, Julie Wilkinson, and then and there against the consent, of her, the said Julie Wilkinson, forcibly and fraudulently, her, the said Julie Wilkinson, did carry and cause to be carried within this State, contrary to the form of the act of assembly, in such case made and provided, and against the peace, government and dignity of the State."

Particularly he alleges the indictment was insufficient because it failed to allege the specific intent required by the statute, Md. Code, Art. 27, § 337 which provides in pertinent part as follows:

> "Every person . . . who shall be convicted of the crime of kidnapping and forcibly or fraudulently carrying or causing to be carried out of or within this State any person, . . . *with in-*

*tent to have such person carried* out of or within this State, or with the intent to have such person concealed within the State or without the State, shall be guilty of a felony . . ." (Emphasis added)

He cites *Midgett v. State,* 216 Md. 26, 139 A. 2d 209 which holds an intent to carry is a specific part of the crime, but does not discuss the contents of the indictment. He cites also *Baker v. State,* 6 Md. App. 148, 250 A. 2d 677 which holds an indictment, under a statute prohibiting the delivery of narcotics to a person "legally detained or confined" (Md. Code, Art. 27, § 122A), must specifically charge the legality of the confinement.

Since it is possible to smuggle narcotics into a place of detention for the use of persons other than those legally confined, it is proper to require the indictment to allege specifically that the smuggled narcotics were for the use of legally confined persons. The same logic is not applicable here since it is manifestly impossible for the accused in the instant case to have assaulted the victim and against her consent forcibly have carried her within this State without having an "intent to have such person carried within this State. . ." Thus, the instant indictment, by implication, alleged the necessary specific intent.

In *Bosco v. State,* 157 Md. 407, 146 A. 238, the Court of Appeals held that an allegation the accused offered money "in an attempt to bribe the said George E. Benson, justice of the peace as aforesaid, to influence the said George E. Benson, justice of the peace as aforesaid, to decide in his favor a certain prosecution then pending before the said George E. Benson, justice of the peace as aforesaid" was sufficient not only because it was alleged in the language of the statute but also because the language used necessarily implied a requirement of knowledge by the accused that George E. Benson was a Justice of the Peace. The Court explained:

"Even where such [specific] allegation is necessary, it need not be an express allegation. [The

specific allegation] is necessarily implied from a statement of the acts which constitute the offense."

Thus, the Court felt that the allegations were sufficiently clear and specific even if they were implied and not expressed.

### III  Merger of the Kidnapping and Rape Statutes

Rice alleges that the crimes of rape and kidnapping in this factual situation merge, citing *People v. King*, 273 N.Y.S.2d 925. The New York rule seems contrary to that reached by a majority of the courts, 17 A.L.R.2d 1003 and is in conflict with the Maryland doctrine of merger which was stated in *Stewart v. State*, 4 Md. App. 565, 569, 244 A. 2d 452 as follows:

"The true test of merger under the modern doctrine is whether one crime necessarily involves the other, viz., when the facts necessary to prove the lesser offense are essential ingredients in establishing the greater offense, the lesser offense is merged into the greater offense."

At the outset it should be noted the problem here is different from when the victim was moved and confined only slightly, as would be necessary to complete the crime of rape. In the instant case the victim was dragged from her apartment and carried several blocks into the accused's apartment. These actions completed the crime of kidnapping. Thereafter, the crime of rape occurred; the kidnapping was in no way an essential element of that crime because that crime could just as easily have occurred at the victim's apartment. It is not necessary for the State to prove the rape to establish the kidnapping nor to prove the kidnapping to establish the rape. The decision that the kidnapping and rape did not merge is based on only the facts of the instant case. We do not predict the result for future cases involving different facts. Sound public policy requires a person committing

two separate crimes be subjected to the possibility of separate punishments. See *Parker v. State,* 7 Md. App. 167, 254 A. 2d 381.

## IV  Sufficiency of the Evidence to Support Burglary Conviction

Rice alleges there was insufficient evidence to support his conviction for common law burglary since his own testimony showed he went to the apartment because of the prostitution arrangement made with an unknown man. Appellant's argument overlooks the well settled principle there is no obligation on trial courts to believe an accused's testimony. *Munger v. State,* 7 Md. App. 710, 256 A. 2d 888. The trial judge accepted the testimony of the victim and found appellant's intent to be more clearly evidenced by his actions as described by the victim than his own testimony.

## V  Statute of Limitations as to Photographing Obscene Matter

Under Indictment No. 6475, appellant was convicted of unlawfully and knowingly photographing obscene matter, meaning the pictures, found in his apartment, of appellant with an unknown woman. The prosecutrix was not shown in the pictures introduced in evidence. There was no evidence or inferences arising therefrom as to the time these pictures had been taken or indeed who took them. Under the rule quoted in *Ruble v. State,* 177 Md. 600, 11 A. 2d 455, the State must prove the crime occurred within the period of limitations, Md. Code, Art. 57, § 11. Since there was no proof as to when or who took these pictures, the motion to acquit as to that charge should have been granted. *West v. State,* 3 Md. App. 123, 238 A. 2d 292.

## VI  Did the Admission of the Obscene Photographs Prejudice the Appellant's Case?

Appellant alleges that his case was prejudiced by admission of the obscene photographs of himself and the unknown woman. Aside from their obvious relevance to

an additional charge, no objection was made below; therefore, the matter is not before us. Maryland Rule 1085.

## VII Was Appellant Improperly Convicted of Unnatural and Perverted Sexual Acts on the Uncorroborated Testimony of an Accomplice?

Appellant contends that Miss Wilkinson was an accomplice in the unnatural sex act in violation of Md. Code, Art. 27, § 554, and therefore her testimony must be corroborated in order to support a conviction. This contention was rejected in *Gregoire v. State,* 211 Md. 514, 128 A. 2d 243, where the Court found, as in the instant case, the act was not voluntarily performed by the victim.

## VIII Is the Unnatural and Perverted Sex Act Statute Unconstitutional?

For the first time on appeal, appellant contends that the unnatural and perverted sex act statute, Md. Code, Art. 27, § 554, is unconstitutional. Having failed to raise this point at trial, appellant cannot raise it for the first time on appeal. See Maryland Rule 1085 and *Woodell v. State,* 2 Md. App. 433, 234 A. 2d 890.

## IX Did the Trial Court Err in Allowing the Prosecutrix to Testify on Direct Examination of Her Telling Two Other People About the Rape, and Subsequently Allowing Those Two People to Corroborate What the Prosecutrix Told Them?

Appellant contends that the trial court erred in allowing the prosecutrix, on direct examination, to recount her immediate complaint to her neighbors. It has been held that evidence of a victim's immediate complaint to another person about an alleged rape is admissible. *Culver v. State,* 1 Md. App. 406, 230 A. 2d 361 and *Hubbard v. State,* 2 Md. App. 364, 234 A. 2d 775. It has also been held the details of the complaint are admissible if the victim has been impeached by other witnesses, or cross-examined as to consent or on the basis that her evidence is false. Since in this case the prosecutrix was cross-examined as

to her consent, as well as impeached by other witnesses, the details of the report were admissible. *See Green v. State,* 161 Md. 75, 155 A. 164. The error in admitting the testimony too early is obviously harmless.

> *All judgments affirmed except as to Indictment No. 6475, photographing obscene pictures, which is reversed without a new trial.*