721 A.2d 207

**STATE of Maryland**

v.

**Edward Charles STOUFFER.**

**No. 28, Sept. Term, 1998.**

Court of Appeals of Maryland.

Dec. 9, 1998.

Diane E. Keller, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on brief), Baltimore, for petitioner.

John L. Kopolow, Assistant Public Defender (Stephen E. Harris, Public Defender), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

WILNER, Judge.

This case arises out of the killing of Jeffrey Fiddler on February 26–27, 1989. Respondent Edward Stouffer was convicted of felony murder and kidnapping, the kidnapping being the underlying felony for the felony murder. A co-defendant, William Burral, who was tried separately and whose appeal is currently pending in this Court, was convicted of second degree murder.

The Court of Special Appeals concluded that, although there was legally sufficient evidence to sustain Stouffer's conviction for kidnapping, there was insufficient evidence to establish that the killing was committed in the perpetration or course of the kidnapping. It thus affirmed the kidnapping judgment but reversed the judgment for felony murder. *Stouffer v. State,* 118 Md.App. 590, 703 A.2d 861 (1997). We granted the State's petition for *certiorari* to review the reversal of the felony murder judgment and Stouffer's cross-petition to review the affirmance of the kidnapping judgment. We shall affirm the Court of Special Appeals as to the kidnapping and reverse as to the felony murder, thereby sustaining the judgments entered by the circuit court.

## BACKGROUND

This was not an easy case for the police to put together. Six years elapsed between the time Fiddler was murdered and the time Stouffer and Burral were indicted. Most of the people interviewed by the police and most of the non-police witnesses who ultimately testified were, at the time of Fiddler's murder, part of a dysfunctional community of youngsters, in their twenties, who knew, lived for various periods with, were once married to, or had children with each other and who socialized and frequently "partied" together. Some of them were associated with drugs, weapons, and other

criminal activity conducted from an establishment known as Rocky's Pizza, and there was evidence that Fiddler's killing may have been connected with that activity—that the participants were concerned that Fiddler was saying more than was prudent about the activity, that their intent was to frighten him or teach him a lesson, and that the endeavor to do so got out of hand. There was also some evidence that Stouffer and others were simply upset over attention Fiddler was paying to one "Becky."

The direct evidence in this case of exactly what occurred is rather thin. No one claims to have witnessed the actual kidnapping, beating, or killing of Fiddler. No weapon was recovered. No fingerprints linking Stouffer or anyone else to the murder were recovered. No confession was obtained. The *State's* evidence as to where the beating or the killing occurred was in dispute. There was some evidence indicating that it may have occurred in or just outside of Robert Schell's apartment at 12 Elizabeth Street, in Hagerstown; other evidence suggested that it occurred in a field or parking lot. Ultimately, the State abandoned the notion that the beating or killing occurred at 12 Elizabeth Street. There was evidence that Schell was involved and evidence that he was not involved. The various witnesses, some of whom had consumed a great deal of alcohol on the night in question, gave different stories of who was involved, what happened, and where it happened. Some of those stories changed over time—trial was held more than seven years after the murder—and a good bit of the evidence was in the form of earlier written statements made to the police that were inconsistent with the witnesses's trial testimony. Much of the evidence was in the form of inculpatory statements allegedly made by Stouffer after Fiddler's death that were overheard and, six years later, reported to the police.

Some facts were not in substantial dispute. Fiddler's body was discovered early on the morning of February 27, 1989, in a ditch by the side of an entrance ramp to Interstate 81, just over the Pennsylvania–Maryland line. He was clad in pants, a sweatshirt, and unlaced shoes, but had on no socks or under-

wear. It was not Fiddler's common practice to go without socks or underwear or to wear his shoes unlaced. There were two stab wounds in the chest, one about eight inches deep, defensive wounds on the right hand, a bruise on the back of the neck, and abrasions on the buttocks and left leg. Based on his entire examination, including blood patterns on the body, the clothes, and the shoes, grass and leaves on the ball of Fiddler's left foot, and greasy and granular material on Fiddler's back, the medical examiner opined that (1) Fiddler died of the large stab wound to the chest, which punctured a lung; (2) that wound would have caused extensive bleeding; (3) the stabbing did not occur where the body was found; (4) Fiddler was probably wearing the sweatshirt, but not the pants or shoes, when stabbed; (5) the pants and shoes were placed back on the body after the stabbing; (6) before Fiddler died and without his pants on, his body had been dragged across a rough granular black surface; and (7) death was not instantaneous, but ensued from bleeding within a half hour after the stabbing. The conclusion that the stabbing occurred elsewhere was supported by the fact that there was very little blood found in the ditch where the body was discovered.

The State's theory was that Stouffer, Burral, and perhaps others in the group kidnapped Fiddler in Hagerstown, that they took him to a field where they forced him to partially disrobe, that they beat him and, possibly to avert his attempt to escape, stabbed him, that they then drove him, as he lay dying, to the Interstate ramp, where they dumped the body. It is not necessary for us to recount all of the evidence in support of that theory, much of which is marginal. We note, however, the following. Rebekah Kogar, who was Stouffer's girlfriend at the time, testified that, on the evening Fiddler was killed, she, Stouffer, Burral, and others were at James Russell's apartment in Hagerstown, that Stouffer, Burral, and Russell left in the late afternoon or evening (as late as between 10:30 and 11:00) and did not return until early the next morning. Upon his return, Burral had "some kind of red stuff all over him," and he changed his clothes. Ms. Kogar overheard a conversation between Stouffer and Burral—

"[s]omething that happened up at Elizabeth Street I think it was. Something got out of hand." They mentioned Fiddler.

Barbara Kelly told the jury that, on the evening before she heard that Fiddler had been killed, she was in downtown Hagerstown, near Rocky's Pizza, when she saw four men, including Stouffer and someone she knew as Billy (inferentially Burral), chasing Fiddler and that she heard Stouffer warn Fiddler to stay away from "Becky." She recalled seeing Stouffer and some men get into a white car, although she could not be certain if that was the same night as the chase. In an earlier statement given to the police, she indicated that it was the same night as the chase. Evidence was presented that Stouffer then owned a white Volkswagen Rabbit. Although Stouffer had told Hagerstown Detective Johnson that Fiddler had never been in his car, FBI agent Wayne Oakes, a forensic scientist, testified that three hairs found in that car were microscopically indistinguishable from sample hairs taken from Fiddler's hairbrush.[1] There was some evidence of a blood trace on the inside of the door of the car, but the sample was not taken until 1995, and it was not suitable for testing. Kathy Argo recalled a conversation in 1989 in which Stouffer told her that the police were trying to connect him to Fiddler's murder, but "they can't prove anything." He added that there had been blood in his car, "but it's been cleaned out."

Much of the evidence against Stouffer came from his own mouth, through statements made to or overheard by others. Richard Ford recalled a conversation with Stouffer in 1990, in which Stouffer mentioned beating a person, for "sticking his nose where it didn't belong." Stouffer added that the beating took place in an alleyway around the corner from Rocky's, that three other men, including Burral, were with him, and that "they beat the heck out of him and he didn't give a damn if he lived or died and said that he . . . that they put him in the van

---

1. Agent Oakes made clear that the microscopic similarity could not be taken as a basis for absolute personal identification and that it was possible, though extremely rare, for someone else to have hair that would be indistinguishable from that of Fiddler.

and dropped him off at the interstate right there at State Line." In an earlier written statement to the police, which was admitted as substantive evidence, Ford recounted that Stouffer had said that "I killed the fucking guy." Fiddler's name, in particular, was not mentioned. Brian Burchett recalled overhearing a conversation between his former girlfriend, Annette Bowman, Stouffer, and Russell in July, 1990, in which Stouffer remarked that "Jeff Fiddler was running his mouth too much and that he deserve[d] what he got."

Patricia Moore, who was part of the operation at Rocky's and was a friend of Stouffer, gave a statement in June, 1995 to Detective Sterner—a statement that she disavowed at trial but which was admitted into evidence—recounting a conversation with Stouffer in which he admitted that he helped to beat Fiddler and that he rode around in a car with him. She recited in her statement Stouffer's admission that "there was a struggle and [Fiddler] was trying to get away a couple of times" and "[t]hat's where they stabbed him there at the field." Stouffer boasted, according to her statement, that he "got a rush and a thrill," that the police would never find out, that "he had gotten away with it," that Fiddler had been in the trunk of the car, and that there were blood stains in the back of the trunk. Connie Minnick said she overheard a conversation between Stouffer and her sister in which Stouffer said that "he didn't want it to go that far." In an earlier statement to the police, she noted Stouffer's further comments that "he just freaked out" and that "he didn't know if [Fiddler] was dead or not. And they were just scared." Ginger Eavey, a friend of Stouffer, recalled hearing him say that Fiddler had been stabbed, put in a vehicle, and dumped "along the State line."

Robert Schell testified to a number of altercations with Stouffer. On the night Fiddler was killed, Schell returned downtown after a good bit of drinking and two previous altercations and encountered Stouffer, who threatened him to the point that he ran for safety into a hotel. Later that evening, he saw Stouffer again. Stouffer accused him of "narking" and warned him that "if I didn't get out of his face I

could be taken care of too." At that point, a police officer came by and separated the two. In March, 1989, according to Schell, he encountered Stouffer in downtown Hagerstown. They had an argument, following which Stouffer began chasing Schell and allegedly pushed him into an oncoming truck. Angela Tobery saw Stouffer and others chasing Schell on that occasion, but she did not see the push.

Stouffer was initially charged with premeditated first degree murder, a variety of first and second degree sexual offenses committed against Fiddler, kidnapping, and felony murder based on the sexual offenses and kidnapping. The only counts submitted to the jury were first degree premeditated murder, of which appellant was acquitted, kidnapping, of which he was convicted, felony murder based on the kidnapping, of which he was convicted, and second degree murder, as to which no verdict was returned. As noted, the Court of Special Appeals affirmed the kidnapping judgment but reversed the felony murder judgment.

## DISCUSSION

### Evidence of Kidnapping

As we indicated, the State contended that Stouffer and others abducted Fiddler in Hagerstown, forced him into Stouffer's car, drove him somewhere where they beat and stabbed him, and then drove him into Pennsylvania, where they dumped his body. On the theory that the intent of this enterprise was to beat Fiddler in order to teach him a lesson, Stouffer urges that the asportation of Fiddler from where he was seized was simply to remove him to a place where he could be beaten, and that an asportation for that purpose does not constitute kidnapping. Nor, he contends, would it constitute kidnapping to transport Fiddler's dead body from the place of stabbing to the ditch in Pennsylvania. The evidentiary challenge, in other words, is not with respect to the proof of his criminal agency, but as to whether (1) the asportation of Fiddler, while still alive, was simply to facilitate the assault, or murder, and did not, therefore, constitute the separate crime

of kidnapping, and (2) the asportation of his dead body, following the stabbing, can constitute kidnapping.

Kidnapping is a statutory crime in Maryland. With an exception not relevant here, Maryland Code (1957 and 1996 Repl.Vol.), Article 27, § 337 makes it a felony to forcibly or fraudulently carry or cause "any person" to be carried out of or within Maryland with the intent to have the victim carried or concealed in or out of the State. That statute, first enacted in 1809, enlarged the common law crime of kidnapping, which was limited to forcibly abducting or stealing a person and sending him or her to another country. *See Midgett v. State,* 216 Md. 26, 38–40, 139 A.2d 209 (1958); *Moore v. State,* 23 Md.App. 540, 329 A.2d 48, *cert. denied,* 274 Md. 730 (1975).

Although no cases are cited by either side, the State essentially concedes that one may not be convicted of kidnapping for carrying around a corpse. The statute speaks in terms of carrying "any person," and, at least for purposes of this case, we shall assume that a corpse is not a "person" within the meaning of the statute. The court below specifically instructed the jury that, to convict Stouffer of kidnapping, it must find that Fiddler was alive when the kidnapping occurred. The question thus focuses on what happened to Fiddler before he died. In that regard, the evidence, recounted above, suffices to show that Stouffer, together with others, in order to frighten Fiddler or "teach him a lesson," abducted Fiddler from somewhere in Hagerstown, took him to a parking lot or field, beat him, stabbed him either to prevent his escape or because the beating enterprise "got out of hand," put him in a car while he was bleeding to death, and dumped his body in Pennsylvania. The evidence permits a reasonable inference of at least two asportations: one from the point of initial abduction to the place where the beating and stabbing occurred, and a second from that point to the entrance ramp in Pennsylvania. In light of the medical examiner's testimony that Fiddler may have lived for as long as a half hour after he was stabbed, the evidence also permits a reasonable inference that he was still alive, for at least part of the time, while he was dragged into the car after being stabbed and driven to Pennsylvania.

There are literally hundreds of reported decisions around the country dealing with whether, and under what circumstances, the detention, confinement, or asportation of a victim initially accosted for the purpose of robbery, sexual assault, or some other crime will suffice to sustain a separate conviction for kidnapping. *See* Frank J. Wozniak, Annotation, *Seizure or Detention for Purpose of Committing Rape, Robbery, or Other Offense as Constituting Separate Crime of Kidnapping*, 39 A.L.R. 5th 283 (1996). Not only do the facts vary from one case to another, so do the State or Federal kidnapping statutes at issue. Some statutes proscribe the confining or restraining of a person, more akin to false imprisonment; others speak of "taking" a person; some, like the Model Penal Code (§ 212.1), include both a confinement and a taking or removal; some are divided into degrees, dependent in part on the defendant's mental state or whether the kidnapping is for the purpose of ransom. Maryland's statute, as noted, requires a "carrying" and is not divided into degrees. Both because of the varying fact patterns and the different statutory provisions, one needs to be very careful in looking for precedential or persuasive decisions.

Courts in dozens of State and Federal cases have followed what has been described as the "traditional rule in American jurisprudence" that "any asportation—i.e., carrying away—of the victim, no matter how short in distance or duration, was sufficient to establish the crime of kidnapping." *Government of Virgin Islands v. Berry*, 604 F.2d 221, 225 (3d Cir.1979); also Wozniak, *supra*, 39 A.L.R. 5th at 356. See, for example, *State v. Vass*, 191 Conn. 604, 469 A.2d 767 (Conn.1983), where the defendant, a customer in a grocery story, ordered the clerk at knifepoint to a stockroom at the back of the store, where he attempted to rape her. Rejecting his argument that he could not be convicted of kidnapping if that offense was "integral or incidental" to the crime of rape, the court concluded that, if the State proved all of the elements of kidnapping, the defendant could be convicted of that offense in addition to another felony "even though the two offenses arose out of the

same conduct." *Id.* at 774. *See also State v. Jacobs,* 93 Ariz. 336, 380 P.2d 998 (Ariz.1963); *Bailey v. State,* 146 Ga.App. 774, 247 S.E.2d 588 (1978); *Wilson v. State,* 253 Ind. 585, 255 N.E.2d 817 (Ind.1970) *Harris v. State,* 78 Wis.2d 357, 254 N.W.2d 291 (Wis.1977). The rationale behind that view is that it is the *fact* of the forcible removal, not its distance, that constitutes the separate crime of kidnapping. The statutory language is read literally and given its broadest meaning.

As the annotator points out, however, a majority of courts have moved away from that approach and now hold that "kidnapping statutes do not apply to unlawful confinements or movements 'incidental' to the commission of other felonies." 39 A.L.R. 5th at 356. The rationale of that approach is the concern that a literal reading of the kidnapping statutes, which often carry significant penalties, can lead to an overzealous enforcement, with the result that "persons who have committed such substantive crimes as robbery or assault— which inherently involve the temporary detention or seizure of the victim—will suffer the far greater penalties prescribed by the kidnapping statutes." *Government of Virgin Islands, supra,* 604 F.2d at 226; *also People v. Levy,* 15 N.Y.2d 159, 256 N.Y.S.2d 793, 204 N.E.2d 842 (N.Y.1965), observing that, if read literally, the kidnapping statute would "overrun" other crimes, such as robbery, rape, and assault; *Cotton v. Superior Court,* 56 Cal.2d 459, 15 Cal.Rptr. 65, 364 P.2d 241, 244 (Cal.1961) and *People v. Daniels,* 71 Cal.2d 1119, 80 Cal.Rptr. 897, 459 P.2d 225, 231 (Cal.1969), expressing concern that "every assault could also be prosecuted for kidnapping ... as long as the slightest movement was involved."

Although some courts have applied that principle to reverse kidnapping convictions even upon proof that a robbery or sex offense victim was taken a considerable distance and held for more than just a brief period of time, most courts following the majority view are more flexible and take a close look at the circumstances to determine whether the confinement or movement truly was "incidental" or "integral" to another

crime.[2] Among other things, courts have looked at how long the victim was held, how far the victim was taken, where the victim was taken, whether the abduction exceeded what was necessary to the commission of the other crime, and whether the abduction itself substantially increased the risk of harm, beyond the risk inherent in the commission of the other crime. *See State v. Farmer*, 191 W.Va. 372, 445 S.E.2d 759 (W.Va. 1994); *State v. St. Cloud*, 465 N.W.2d 177 (S.D.1991).

In an effort to guide judges and juries in determining when a separate conviction for kidnapping is permissible, some courts have devised standards or guidelines, focusing principally on distance, duration, and danger. In *Government of Virgin Islands v. Berry, supra,* 604 F.2d 221, the court reviewed earlier pronouncements and concluded, at 227:

"We believe that despite the variance in terminology, four factors are central to each of these approaches. Those factors are: (1) the duration of the detention or asportation; (2) whether the detention or asportation occurred during

---

**2.** Examples of the somewhat rigid view are the decisions of the New York Court of Appeals in *People v. Levy, supra,* 15 N.Y.2d 159, 256 N.Y.S.2d 793, 204 N.E.2d 842 and *People v. Lombardi,* 20 N.Y.2d 266, 282 N.Y.S.2d 519, 229 N.E.2d 206 (N.Y.1967). In *Levy,* the victims were abducted in their car and driven around New York City for about 20 minutes, covering some 27 blocks, during which time they were robbed of their jewelry. The New York kidnapping law at the time made an unlawful *confinement* a kidnapping. Noting that some restraint or confinement was inherent in the crime of robbery, the court gave the kidnapping statute a narrow meaning and reversed the kidnapping convictions in that case. The same narrow reading was given in *Lombardi,* where the court held that the transportation of drugged girls from Manhattan to a motel in Queens was part of the crimes of assault and attempted rape and did not justify a separate conviction for kidnapping. In *People v. Miles,* 23 N.Y.2d 527, 297 N.Y.S.2d 913, 245 N.E.2d 688, 695 (N.Y.1969), the court, noting a change in the New York kidnapping statute following *Lombardi,* retreated somewhat, observing that the *Levy–Lombardi* rule "was designed to prevent gross distortion of lesser crimes into a much more serious crime by excess of prosecutorial zeal" and was not intended "to merge 'true' kidnappings into other crimes merely because the kidnappings were used to accomplish ultimate crimes of lesser or equal or greater gravity." Upholding the kidnapping conviction in that case, the court further observed that "it is the rare kidnapping that is an end in itself; almost invariably there is another ultimate crime." *Id.*

the commission of a separate offense; (3) whether the detention or asportation which occurred is inherent in the separate offense; and (4) whether the asportation or detention created a significant danger to the victim independent of that posed by the separate offense."

That "test" has also been adopted in the Eleventh Circuit. *See United States v. Howard,* 918 F.2d 1529 (11th Cir.1990).

In *State v. Buggs,* 219 Kan. 203, 547 P.2d 720, 731 (Kan. 1976), the Kansas court adopted a tripartite test of whether the movement or confinement was "slight, inconsequential," whether it was "of the kind inherent in the nature of the other crime," and whether it had "some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection." That test has been adopted in Delaware and Florida as well. *See Burton v. State,* 426 A.2d 829 (Del.Supr.Ct.1981); *Faison v. State,* 426 So.2d 963 (Fla.1983). The District of Columbia court has focused on "whether the kidnapping substantially increased the risk of harm to the victim beyond that inherent in the underlying crime." *Nelson v. U.S.,* 601 A.2d 582, 598 (D.C.1991).

A wide variety of cases are reviewed in the A.L.R. annotation. They involve victims forced *into* an office or residence and robbed, raped, or assaulted, victims moved *from* an office or residence to some other place, victims confined within one room, victims moved from one room to another, carjack victims forced to drive or remain as passengers in their own car, victims forced into the defendant's vehicle and driven to some other place, victims detained and transported in commercial vehicles, and victims forced from where they were accosted into alleys, fields, woods, or buildings of one kind or another. They involve situations in which the victim was transported only a few yards, several blocks, several miles, or many miles, victims held for varying periods of time from a few minutes to several hours to more than a day, victims released promptly after commission of the other crime and victims restrained for longer periods or killed. In each of these categories are cases

sustaining and cases reversing separate kidnapping convictions. Wharton echoes the splintering of the decisions:

"At times, in committing the crime of robbery or rape, the victim may be moved, as where a robbery victim is pushed from the sidewalk into a nearby alley or hallway so that his wallet can be taken, where a robbery victim is moved from room to room in his home so that the house can be searched for valuables, or where a rape victim is pushed from the sidewalk into a nearby alley or driven to a more distant place. In such cases, depending upon whether the movement of the victim is merely incidental to the commission of the crime of robbery or rape, the movement will or will not constitute the separate offense of kidnapping. Similarly, depending upon whether the movement of a victim is merely incidental to the commission of some other crime, the movement will or will not constitute the separate offense of kidnapping."

2 Charles E. Torcia, WHARTON'S CRIMINAL LAW (15th ed.) § 207.

The one thing that seems clear from the decisions following the majority view is that most of them are fact-specific. Whether the confinement or movement of the victim is merely incidental to another crime depends, in nearly every case, on the circumstances, even when guidelines of the types noted above are applied. If the victim is not moved too far, is not held for longer than is necessary to complete the other crime, and is not subjected to any significant peril from the confinement or movement itself, if the confinement or movement can reasonably be viewed as undertaken solely to facilitate the commission of the other crime, and if commission of the other crime normally involves (even if it does not legally require) some detention or asportation of the victim, the court is likely to conclude that the confinement or movement was merely incidental to the other crime and thus reverse a separate kidnapping conviction. If any of those factors are missing, however, there is a greater prospect of the court sustaining a separate kidnapping conviction. See In re Earley, 14 Cal.3d 122, 120 Cal.Rptr. 881, 534 P.2d 721 (Cal.1975); State v. Lykken, 484 N.W.2d 869 (S.D.1992).

The Court of Special Appeals has dealt with the issue on a number of occasions. In the first two cases, *Lester v. State*, 9 Md.App. 542, 266 A.2d 361, *cert. denied*, 259 Md. 733 (1970) and *Rice v. State*, 9 Md.App. 552, 267 A.2d 261, *cert. denied*, 259 Md. 735 (1970), the court recognized the "incidental" or "integral part" issue but held that the facts justified a separate kidnapping conviction. In *Lester*, the defendant seized the victim on a parking lot, forced her at knifepoint into his car, drove some distance to a wooded area where he raped her, and then drove her back to the parking lot. Affirming separate convictions for rape and kidnapping, the court noted, at 544–45, 266 A.2d 361:

"Whether under a given set of circumstances, acts which fall within the technical statutory definition of kidnapping would not be sufficient to support a conviction of that crime because they were an 'integral part' of another crime is a problem which does not confront us in this case for an examination of the record discloses that there was ample evidence before the trial judge from which he could find, beyond a reasonable doubt, that the kidnapping and rape were separate and distinct crimes and that, contrary to appellant's contention, the kidnapping was not merely 'a means to an end.'"

In *Rice*, the defendant, believing the victim to be a prostitute, broke into her apartment, assaulted her, took her forcibly several blocks away to his apartment where he committed a number of sexual offenses, kept her there all night, and walked her home the next morning. On appeal, he argued that his convictions for rape and kidnapping should merge. Rejecting that argument, the court noted that "the problem here is different from when the victim was moved and confined only slightly, as would be necessary to complete the crime of rape. In the instant case the victim was dragged from her apartment and carried several blocks into the accused's apartment. These actions completed the crime of kidnapping." *Id.* at 566, 267 A.2d at 269.

In three later cases, the court, though it *could* have sustained a separate kidnapping conviction on the ground that the

kidnapping was not incidental to or an integral part of the other crime, nonetheless articulated the principle, taken from Rollin M. Perkins, CRIMINAL LAW, § 7 at 177 (2d ed.1953), that "[i]t is the fact of asportation and not the distance that is controlling." In *Moore v. State, supra* 23 Md.App. 540, 329 A.2d 48, the defendant accosted the 11–year old victim as she was riding her bicycle, forced her into his car, drove to an abandoned farmhouse, took her into some bushes, and raped her. The court rejected the defendant's complaint that the State failed to prove how far the child was transported, on the ground that the distance was irrelevant. That principle was applied as well in *Isaacs v. State,* 31 Md.App. 604, 616, 358 A.2d 273, *cert. denied,* 278 Md. 724 (1976). The defendants there abducted the victim in Pennsylvania as part of a carjacking, drove him into Maryland where they killed him, and then proceeded to Florida in his car. The point made by the court was that the evidence sufficed to show a kidnapping in Maryland, not just in Pennsylvania. *See also Tate and Hall v. State,* 32 Md.App. 613, 363 A.2d 622 (1976). Finally, in *Carey v. State,* 54 Md.App. 448, 458 A.2d 90, *aff'd,* 299 Md. 17, 472 A.2d 444 (1984), where the defendant sexually assaulted the victim in an upstairs bedroom and then dragged her down to the basement and locked her in a closet for more than a day, the court, though repeating the principle that " 'it matters not that the victim was asported but a short distance,' " affirmed the separate kidnapping conviction on the basis that "the necessary asportation and concealment occurred *after* the sexual offenses had been terminated." *Id.* at 452, 458 A.2d at 92.

As we observed earlier, the Maryland kidnapping statute, § 337, requires a *carrying* of the victim. To that extent, it is unlike the allied crime of false imprisonment and other kidnapping statutes that punish certain unlawful detentions and concealments, even in the absence of an asportation. *Midgett v. State, supra,* 216 Md. at 38–40, 139 A.2d at 215–16. We recognize the problem articulated by the Third Circuit, New York, and California courts, among others, that a literal reading of the kidnapping law could have the effect of trans-

forming a host of lesser-punished sex and street crimes into 30–year eligible kidnappings, and we do not believe that the Legislature ever intended for § 337 to be read in that broad a fashion. On the other hand, we recognize equally well the fact noted in *People v. Miles, supra,* 297 N.Y.S.2d 913, 245 N.E.2d at 695, that "it is the rare kidnapping that is an end in itself; almost invariably there is another ultimate crime." True kidnappings are *usually* undertaken for the purpose of committing some other crime, often extortion.

We aline ourselves with the majority approach that examines the circumstances of each case and determines from them whether the kidnapping—the intentional asportation—was merely incidental to the commission of another offense. We do not adopt, however, any specific formulation of standards for making that determination, but rather focus on those factors that seem to be central to most of the articulated guidelines, principally: How far, and where, was the victim taken? How long was the victim detained in relation to what was necessary to complete the crime? Was the movement either inherent as an element, or, as a practical matter, necessary to the commission, of the other crime? Did it have some independent purpose? Did the asportation subject the victim to any additional significant danger?

Applying those factors, it is clear that the evidence sufficed to sustain a separate kidnapping conviction for Stouffer. Although the record does not establish precisely where Fiddler was taken, there is certainly a fair inference, to be drawn from the fact that he was driven there and that it may have been a field outside the center of Hagerstown, that the distance was a considerable one. This was not a situation where the victim was simply dragged a short distance into a nearby alley or building. If the objective was simply to beat Fiddler, as Stouffer suggests, that kind of asportation was unnecessary. As noted, Stouffer was not above physical violence in the middle of Hagerstown; he was seen chasing and threatening Fiddler along the streets and later was seen chasing and threatening Schell. Fiddler could have been beaten anywhere. If, on the other hand, the desire to "teach him a

lesson" extended beyond a beating, which the evidence also suggests, the kidnapping would have had an independent purpose; the seizure and asportation, coupled with stripping him from the waist down, would have been part of the frightening lesson. In that scenario as well, therefore, the kidnapping would not have been incidental to any other crime, but would have had its own function and significance.

Even if we accept that Stouffer's intent was principally to beat Fiddler, the kidnapping substantially increased his peril. Apart from the risks associated simply with being forced into a compact car with three or four other men and driven for some distance as a hostage, the grave peril implicit from being taken to a field somewhere, alone, completely at the mercy of his abductors, and with no prospect of escape or assistance, is obvious. That peril is different from and far exceeds the risks inherent in an assault on the streets of downtown Hagerstown.

▪ Moreover, the kidnapping did not end at the place where Fiddler was stripped and beaten. After he was stabbed, whether because of a "thrill" or a "rush," to prevent his escape, or because the enterprise "got out of hand," the evidence indicates that he was dragged into the car and, while still alive, driven to Pennsylvania. That conduct suffices at least as a continuation of the kidnapping. As noted in *State v. Gomez*, 225 Conn. 347, 622 A.2d 1014, 1016 (Conn.1993), [b]ecause kidnapping involves interfering with the victim's liberty, it continues until that liberty is restored." *See also State v. Dove*, 52 Wash.App. 81, 757 P.2d 990 (Wash.App.1988). As was the case in *Gomez, supra,* "[b]ecause the victim in this case was never released, the kidnapping ended only with his death." That aspect of the kidnapping was certainly not merely incidental to the beating.

### The Felony Murder

▪ As noted, the jury was specifically instructed that, to convict Stouffer of felony murder, the State was required to prove "that the defendant or another participating with the defendant committed a felony and specifically kidnaping, that

the defendant or another participating in the crime killed Jeffrey Lynn Fiddler and that the act resulting in the death of Jeffrey Lynn Fiddler occurred during the commission of the kidnaping." The jury obviously believed, beyond a reasonable doubt, that the State had proved those things.

The Court of Special Appeals concluded otherwise. It determined that "[i]n no sense can Fiddler's death be viewed as the 'result or outcome' of a kidnapping that [Stouffer] and his bellicose band intended to perpetrate." *Stouffer v. State, supra,* 118 Md.App. at 616, 703 A.2d at 874. That, in turn, arose from the appellate court's determination that Stouffer's "overarching intent" was not to kidnap Fiddler but simply to beat him. The court held at 118 Md.App. at 620, 703 A.2d at 875, that "[t]here was no direct or inferential evidence before the trier of fact that the announced purpose of Stouffer's mission—to scare Fiddler—was to be accomplished by forcibly confining and transporting him." All of the evidence, it said, indicates that "the means to be employed in intimidating Fiddler or placing him in fear" was "the infliction of serious bodily harm in a reckless and dangerous manner with indifference to the consequences." *Id.* at 620, 703 A.2d at 876. In his brief, Stouffer puts the point more succinctly: "The beating that culminated in the fatal stabbing was not done to further the kidnapping; rather, the kidnapping was carried out to further the beating. As a result there was no felony murder."

In supporting the conclusion of the intermediate appellate court, Stouffer cites *Campbell v. State,* 293 Md. 438, 444 A.2d 1034 (1982) and a number of out-of-State cases that we cited in *Campbell.* The issue in *Campbell* and in most of the cases cited by Stouffer was whether a participant in a robbery or other felony could properly be convicted of felony murder when the person killed was killed by someone other than a participant. In *Campbell,* for example, a co-participant with Campbell in an armed robbery was killed either by the robbery victim, shooting in self-defense, or by a police officer in a concurrent attempt to apprehend the co-participant. We joined the prevailing view that "under the felony-murder doctrine a participating felon is not guilty of murder when the

killing is done by a person other than the participating felon or his co-felons." *Campbell, supra,* 293 Md. at 443, 444 A.2d at 1037. That is not, of course, the issue here. The more pertinent point sought to be drawn from *Campbell* and the other cases is that stated in *Commonwealth v. Redline,* 391 Pa. 486, 137 A.2d 472, 476 (Pa.1958) and quoted by us in *Campbell,* that "[t]he mere coincidence of homicide and felony is not enough to satisfy the requirements of the felony-murder doctrine. 'It is necessary ... to show that the conduct causing death was done in furtherance of the design to commit the felony.'"

That principle, that there must be some nexus between the killing and the underlying felony, is not really in dispute and, indeed, is clear from the Maryland felony murder statute itself. Maryland Code, Article 27, § 410 makes all murder committed "in the perpetration of, or attempt to perpetrate, any ... kidnapping as defined in [§ 337] ... murder in the first degree." The question, then, is simply whether the evidence sufficed to show that Fiddler was murdered "in the perpetration of" a kidnapping. In that regard, we take issue with Stouffer and the Court of Special Appeals that the "overarching intent" of Stouffer and his cohorts was simply to beat Fiddler and that the kidnapping was carried out solely in furtherance of that intent. For one thing, that presumed "overarching intent" found by the Court of Special Appeals is quite irrelevant. Whatever may have been Stouffer's motive, we have already determined that there was sufficient evidence to establish a kidnapping, and it is clear, really beyond cavil, that the stabbing occurred "in the perpetration" of that kidnapping. There was evidence that Fiddler was stabbed in order to prevent his escape. Because kidnapping is a continuing crime, remaining in effect until the hostage is safely released, the stabbing was necessarily "in furtherance of the felonious undertaking." *Campbell v. State, supra,* 293 Md. at 446, 444 A.2d at 1039, quoting from *Commonwealth v. Redline, supra,* 391 Pa. at 496, 137 A.2d at 476. It appears as well that there *was* evidence of an independent intent to kidnap Fiddler, that the kidnapping itself—the forcible removal of

Fiddler to a place where he would be isolated and helpless, where he could be stripped, humiliated, and beaten—was what was intended to "teach him a lesson." The evidence therefore did suffice to indicate that the beating may have been part of the kidnapping, not the other way around. In both events, the Court of Special Appeals erred in reversing the felony murder judgment.

### *Erroneous Instruction*

Stouffer adds to his brief the additional complaint that the court improperly instructed the jury that it could find him guilty of felony murder if it found that the killing occurred *during* a kidnapping. Apart from the fact that no objection was made to that instruction, the complaint was not included in Stouffer's conditional cross-petition. We therefore shall not address the issue.

JUDGMENT OF COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM JUDGMENTS OF CIRCUIT COURT FOR WASHINGTON COUNTY; RESPONDENT STOUFFER TO PAY THE COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS.